## PEOPLE v HOLLOWAY

Docket No. 65452. Argued December 1, 1981 (Calendar No. 1).—Decided December 23, 1982. Certiorari denied by the Supreme Court of the United States on May 2, 1983.

Charles E. Holloway was convicted by a jury in the Calhoun Circuit Court, Paul Nicolich, J., of possession of heroin and of possession of cocaine. The Court of Appeals, R. B. Burns, P.J., and J. H. Gillis and D. C. Riley, JJ., affirmed in an opinion per curiam (Docket No. 78-473). The defendant appeals, contending that a search of his mouth by police officers without a search warrant incident to an arrest on a traffic warrant was unreasonable and that evidence obtained as a result of the search should have been suppressed by the trial court.

In an opinion by Justice Coleman, joined by Chief Justice Fitzgerald and Justices Williams and Ryan, the Supreme Court *held:*

Under the circumstances of this case, the taking of the drugs from the defendant's mouth was reasonable. The police effected a lawful arrest pursuant to a valid warrant, and the evidence thereafter discovered was obtained lawfully. The fact that the officers made the arrest on a traffic warrant realizing that they might find narcotics or other evidence of illegal activity is entirely irrelevant. The trial court's finding that the police had probable cause to believe that a crime was being committed in their presence was not clearly erroneous.

1. An intrusive search of a body cavity by the police which so

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 68 Am Jur 2d, Searches and Seizures §§ 29, 105.
Physical examination or exhibition of, or tests upon, suspect or accused, as violating rights guaranteed by Federal Constitution— Federal cases. 22 L Ed 2d 909.
[3-6] 5 Am Jur 2d, Arrest § 3.
[4] 68 Am Jur 2d, Searches and Seizures § 39.
Lawfulness of search of motor vehicle following arrest for traffic violation. 10 ALR3d 314.
[6] 68 Am Jur 2d, Searches and Seizures §§ 23, 88.
Search and seizure of objects in "plain view"—Supreme Court cases. 29 L Ed 2d 1067.

denigrates human dignity as to shock the conscience or which in some other way is unreasonable under the Fourth Amendment may not be sanctioned. However, use of a reasonable amount of force in conjunction with the use of a reasonable method to execute a search for the purpose of preventing the destruction of material evidence of a crime is constitutionally permissible.

2. Under the totality of the circumstances of this case, the search of the defendant's mouth did not abridge his right to be free from unreasonable searches and seizures. The actions of the police in retrieving evidence from the defendant's mouth were not conduct which is shocking to the conscience. The method and manner of the search were reasonable and no more force was used than was reasonably necessary. Moreover, exigent circumstances existed which made it extremely impractical for the police to obtain a warrant. No less intrusive alternatives were reasonably available to the police officers. The tests for differentiating between constitutional and unconstitutional intrusions into a defendant's body, as outlined by the Supreme Court of the United States, were amply satisfied in this case.

Affirmed.

Justice Levin, joined by Justice Kavanagh, dissenting, would hold that the evidence seized following a search of the defendant incident to an arrest on a traffic warrant must be suppressed. The stop and the arrest were an obvious subterfuge to search for narcotics; the search and seizure were unreasonable.

1. The lawfulness of an arrest does not automatically render any contemporaneous search and seizure by the police reasonable. A police officer must have probable cause to search. If an arrest is a pretext for making a search, the evidence obtained is inadmissible. An otherwise unlawful search incident to an arrest on a traffic warrant is not made legitimate by the discovery of contraband.

2. It is reasonable for an arresting officer to search for weapons or for evidence in the possession of the person arrested to insure the officer's safety and to prevent concealment or destruction of the evidence. When a person is arrested for a traffic violation, however, there is almost never evidence of the crime which is the subject of the arrest and, hence, nothing to be destroyed. While there may be some reason for concern for an officer's safety during a routine traffic arrest, where the arrest is merely a pretext for making a search which otherwise would violate the Fourth Amendment, the potentially dangerous situation has been created by the officer solely to justify the

search. It would subvert the Fourth Amendment to permit this artificially created danger to serve as a basis for a search.

3. The police may search in order to facilitate an otherwise lawful arrest; they may not arrest in order to facilitate an otherwise unlawful search. In this case, the circumstances permit the inference that the arrest of the defendant was merely an excuse to search for narcotics. It is unnecessary to speculate about the subjective intent of the officers because the objective evidence is clear. The fruits of the search must be suppressed.

4. Evidence seized without a warrant as a result of plain-view observations during a lawful arrest is admissible. The police must have prior justification for the intrusion. Justification for a seizure does not exist where plain-view observations occur during a pretext arrest. The police may not use an arrest as a subterfuge for conducting a search, or for making plain-view observations. There is no reason to permit the police to make unnecessary intrusions without warrants to obtain evidence which they otherwise could not obtain.

99 Mich App 174; 297 NW2d 607 (1980) affirmed.

## OPINION OF THE COURT

1. SEARCHES AND SEIZURES — BODY CAVITIES — WITHOUT A WARRANT.

A warrant is not required for every intrusive search of any body cavity; the validity of an intrusion by the police without a search warrant into the mouth of a person whom they have arrested to retrieve contraband should be determined on the totality of the circumstances.

2. SEARCHES AND SEIZURES — BODY CAVITIES — MOUTH.

A forcible search without a warrant of a defendant's mouth and removal of foil wrappers containing heroin and cocaine from his mouth was not an unreasonable search and seizure where the defendant was stopped on a valid traffic warrant, and the arresting officers, who knew him well, saw film canisters frequently used to store foil wrappers of narcotics on the seat of his car, found a brown powdery residue in the canisters, saw that the defendant was chewing something, and got no answer when they asked him what he was chewing although he had always been talkative when they had spoken to him in the past, and where the search of the mouth was accomplished quickly with no injury to the defendant using no more force than was necessary; exigent circumstances made it impractical to get a warrant because the defendant, in chewing the narcot-

ics, was destroying what was likely the only evidence of a felony he was committing in the presence of the officers.

DISSENTING OPINION BY LEVIN, J.

3. SEARCHES AND SEIZURES — WITHOUT A WARRANT — PRETEXT ARRESTS — EVIDENCE — ADMISSIBILITY.

Evidence seized without a warrant incident to an arrest which is merely a pretext for making a search is inadmissible; an otherwise unlawful search incident to an arrest is not made legitimate by the discovery of contraband.

4. SEARCHES AND SEIZURES — WITHOUT A WARRANT — PRETEXT ARRESTS.

A search for weapons or evidence without a warrant incident to an arrest on a traffic warrant is unreasonable where the arrest is a pretext to justify the search; evidence of the crime which is the subject of the arrest will almost never be present, and the potentially dangerous situation justifying a search for weapons was created by the arresting officer.

5. SEARCHES AND SEIZURES — WITHOUT A WARRANT — PRETEXT ARRESTS.

The police may conduct a search without a warrant in order to facilitate an otherwise lawful arrest; however, they may not arrest a person in order to facilitate an otherwise unlawful search.

6. SEARCHES AND SEIZURES — WITHOUT A WARRANT — PRETEXT ARRESTS — PLAIN-VIEW OBSERVATIONS — EVIDENCE — ADMISSIBILITY.

Seizure of evidence without a warrant is not justified by plain-view observations by police officers during an arrest which is merely a pretext for conducting a search; in order for evidence seized as a result of plain-view observations to be admissible, the police must have prior justification for the intrusion.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Conrad J. Sindt,* Prosecuting Attorney, and *John H. MacFarlane,* Chief Assistant Prosecutor, for the people.

State Appellate Defender (by *Karla Kendall)* for defendant.

COLEMAN, J. *(for affirmance)*. Defendant seeks to reverse his convictions for possession of heroin and possession of cocaine on the ground that the trial court erred in failing to suppress tinfoil packets containing such drugs that the police retrieved from his mouth. He argues, first, that the search followed an unlawful pretextual arrest, and second, that the search of his mouth was otherwise unreasonable under the Fourth Amendment.

It is argued that defendant's conviction should be reversed on the ground that the arrest pursuant to a warrant for a traffic violation was a pretext for the search. There is no constitutional significance in this assertion, and likewise we find defendant's other contention to be without merit.

I

The only persons testifying at the suppression hearing were the two Battle Creek police officers who effected the arrest and search. Officer Nibley DiMattio testified that on November 23, 1976, he was the sergeant in charge of the tactical surveillance unit involved in the investigation of various forms of street crime, including narcotics offenses. On that date, as he was working in plain clothes in an unmarked vehicle with fellow officer Thomas O'Connell, he saw defendant, for whom there was an outstanding arrest warrant, driving a car. DiMattio followed defendant and sounded his horn to prompt defendant to pull over to the curb. Defendant obliged. DiMattio approached defendant's car on the driver's side and advised defendant that he had a traffic warrant for his arrest. The officer noticed two open plastic film canisters between defendant's legs on the front seat of the car. This observation was relayed to Officer O'Connell, who was stationed at the passenger side of defendant's

car. Defendant was removed from the vehicle and was placed under arrest for driving with a suspended license. O'Connell, who in the meantime had seized the canisters, told DiMattio that the canisters contained a brown powdery residue.

The usually talkative defendant said nothing during this period, but was seen to be chewing on something.

The suppression hearing transcript additionally reveals that DiMattio had been acquainted with defendant, had arrested defendant previously, and, at the time of the search, was aware of defendant's recent arrest for possession of narcotics. The officer had spoken to defendant on numerous earlier occasions ("at least 20 times"), and defendant always had been talkative.[1] From his experience

---

[1] The substance of the officer's testimony with regard to defendant's usual willingness to talk is as follows:

"Q. [Mr. Norlander (Prosecuting Attorney)]: Now, you also indicated that Mr. Holloway wasn't saying anything to you. Had you had occasion to talk to Mr. Holloway before on previous occasions?

"A. [Officer DiMattio]: On numerous occasions.

"Q. Prior to the 23rd of November?

"A. Yes, sir.

"Q. All right. And has Mr. Holloway ever been hesitant to talk to you about anything?

"A. Absolutely not.

"Mr. Hofman: I object to that as well, your Honor; that the fact that he on this occasion may have exercised his right to remain silent in no way is material and I think it's error for the prosecutor to elicit that.

"Mr. Norlander: I'm [sic] Honor, I'm just trying to go back into the probable cause again with the officer. I believe that the whole situation, the officer's knowledge of the defendant, his relationship with him, his past meetings and dealings with the defendant, I think all go to the issue of probable cause.

"The Court: Is this just one meeting prior that you base this on or more?

"The Witness: On every occasion that I've had contact with Mr. Holloway, sir.

"The Court: How many occasions have you had contact with him?

"The Witness: Countless times, your Honor. I would see Mr. Hollo-

with narcotics trafficking, DiMattio knew that controlled substances frequently are stored in tinfoil packets, which then are placed in moisture-proof film canisters.

Several times, DiMattio asked defendant what he had in his mouth. Defendant shook his head and declined either to answer or to open his mouth, but continued to chew. DiMattio advised defendant that if he failed to open his mouth of his own accord his mouth would be forcibly opened. Defendant did not respond. Assisted by O'Connell, DiMattio proceeded to apply pressure to the sides of defendant's jaws below the cheekbones, while defendant, handcuffed since arrest, was leaning back against the car. Placing his fingers inside of defendant's mouth, DiMattio retrieved nine chewed tinfoil packets which further analysis proved contained heroin and cocaine. The forcible extraction was quickly accomplished. Defendant was not harmed as a result of the encounter.

Officer O'Connell, the other witness at the suppression hearing, confirmed much of Officer DiMattio's testimony. In addition, he stated that he assisted DiMattio in the search of the defendant's mouth by pressing on defendant's throat to prevent him from swallowing whatever was in his mouth. According to O'Connell, the entire procedure took approximately ten seconds, and defen-

way a number of times where I've had particular conversations with him and personal contact at least 20 times prior to that.

"*The Court:* It's your statement that on all those occasions he was talkative with the exception of this one?

"*The Witness:* Absolutely.

"*The Court:* For that—to show that purpose, then, your objection is overruled.

"*Mr. Norlander:* All right. Thank you, your Honor."

dant remained standing throughout the search. O'Connell, who also had talked with defendant on prior occasions, had "never known Charlie to keep quiet", and considered it most unusual that defendant kept his mouth closed on this particular day.

In denying defendant's motion to suppress the evidence,[2] the trial judge emphasized the officers' previous confrontations with defendant; their observation of the chewing motion made by defendant, along with his uncharacteristic silence; their experience in the manner in which narcotics are packaged for street purposes; the discovery of a brown residue in the film canisters; and the exigency of the circumstances, *i.e.,* that evidence of a crime was being destroyed and defendant's own life may have been in peril (the officers had no specific knowledge as to whether the narcotics they had reason to believe were lodged in defendant's mouth were in loose form or were packaged). The Court of Appeals ruled that the trial court's determination in this regard was not clearly erroneous.

## II

Defendant argues, and our colleague would agree, that the heroin and cocaine obtained from his mouth should have been suppressed because the evidence was discovered following a "pretext" arrest. Defendant asserts that his arrest, pursuant to a warrant the police officers were carrying, for driving with a suspended license, was effectuated merely for the purpose of allowing a search. We are not persuaded that any constitutional infirmities were present. The police effectuated a lawful

---

[2] An earlier motion to suppress, made by defendant at the time of his preliminary examination, had been denied by the district judge.

arrest pursuant to a valid warrant. The evidence they thereafter discovered was also obtained lawfully, as discussed below. The fact that the police officers effectuated the arrest also realizing that they might find narcotics or other evidence of illegal activity is entirely irrelevant, unless police officers primarily concerned with enforcing certain laws are prohibited from enforcing other laws as well. We are aware of no such constitutional proscription.

## III

On appeal, defendant contends that the forcible search of his mouth violated his right under the Michigan and United States Constitutions to be free from unreasonable searches and seizures.[3] A natural starting point for a discussion of the constitutional implications of a search of a person's mouth is with the prominent decisions of the United States Supreme Court on the subject of intrusive searches. Two cases are foremost, *Rochin v California,* 342 US 165; 72 S Ct 205; 96 L Ed 183 (1952), and *Schmerber v California,* 384 US 757; 86 S Ct 1826; 16 L Ed 2d 908 (1966).

*Rochin* was decided before *Mapp v Ohio*[4] pronounced the Fourth Amendment exclusionary rule applicable to the states, and so was premised upon the due process principles outlined in the Fourteenth Amendment. In *Rochin,* three police officers, acting pursuant to an obscure tip that Rochin was dealing in narcotics, entered his home without a warrant and observed Rochin place some capsules in his mouth. Without probable cause to believe that the substances Rochin was attempting

[3] US Const, Am IV; Const 1963, art 1, § 11.
[4] 367 US 643; 81 S Ct 1684; 6 L Ed 2d 1081 (1961).

to swallow were contraband, the officers grappled with him in an attempt to retrieve the capsules from his mouth. When this effort proved futile, Rochin was handcuffed, transported to a hospital, and forced to ingest an emetic solution which caused him to vomit the capsules. Further analysis indicated that the capsules contained morphine. The capsules were the principal evidence against Rochin at his trial on charges of possessing a morphine preparation. The Supreme Court concluded that the methods used to extract the evidence from Rochin were "too close to the rack and the screw to permit of constitutional differentiation" and were shocking to the conscience. *Rochin,* 342 US 172. *Rochin* has been criticized as having failed to establish a clear workable standard because the Court did not say whether reversal was predicated upon a combination of the circumstances surrounding the extraction of the evidence, or the body intrusion alone.[5] But see *Blackford v United States,* 247 F2d 745 (CA 9, 1957), a border search case which distinguished *Rochin* in part because *Rochin* portrayed a sequence of offensive conduct.

In *Schmerber,* the second[6] noteworthy intrusive search case, the Supreme Court considered a variety of constitutional challenges,[7] but primarily

---

[5] See Minton, Recent Cases, *Criminal Procedure—Surgical Removal of Evidence,* 43 Mo L Rev 133, 134 (1978).

[6] Also deserving of mention is a case decided between *Rochin* and *Schmerber, Breithaupt v Abram,* 352 US 432; 77 S Ct 408; 1 L Ed 2d 448 (1957). The *Breithaupt* Court, in a pre-*Mapp* context, confronted with the due process implications of a *Schmerber*-like involuntary extraction of a blood sample, upheld the procedure, finding it neither brutal nor offensive.

[7] In addition to his claim based upon the Fourth Amendment guarantee against unreasonable searches and seizures, the defendant asserted that his Fourteenth Amendment right to due process, his Fifth Amendment privilege against self-incrimination, and his Sixth

focused upon the reasonableness of the search which had been conducted. The factual scenario of *Schmerber* is markedly different from that of *Rochin*. *Schmerber* concerned a nonconsensual taking for purposes of chemical analysis of a blood sample from the defendant at a hospital where he was being treated for injuries sustained in an automobile collision. The analysis report, which revealed that the defendant had a certain percentage of alcohol in his blood, was admitted at the defendant's trial on charges of driving while under the influence of intoxicating liquor. Noting that "the Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner", *Schmerber,* 384 US 768, the Supreme Court concluded that, on the facts presented, no Fourth Amendment violation had been demonstrated. The Court listed several criteria to be considered in deciding the reasonableness of an intrusive search: (1) the government must have a "clear indication that in fact such [incriminating] evidence will be found"; (2) the police officers must have a warrant, or, in the absence of a warrant, there must be exigent circumstances, such as the imminent destruction of evidence, to excuse the warrant requirement; and (3) the method used by the government to extract the evidence must be a reasonable one, and must be performed in a reasonable manner. 384 US 770-772. The Court sanctioned "minor intrusions into an individual's body under stringently limited conditions", 384 US 772, but emphasized that its judgment was restricted to the facts under consideration.

Amendment right to counsel had been infringed by the extraction of his blood and its use as evidence against him at trial.

IV

Turning to the precise issue before us—the constitutional validity under the circumstances of a search of the defendant's mouth without a warrant for evidence of a crime—the weight of authority is that the use of a reasonable amount of force by the government, in conjunction with the use of a reasonable method in executing the search, for the purpose of preventing the destruction of material evidence of a crime, is constitutionally permissible. See, *e.g., State v Lewis,* 115 Ariz 530; 566 P2d 678 (1977) (due process was not infringed where the defendant was nervous, evasive, spoke with her teeth clenched, and made a swallowing motion when asked by the police officer to open her mouth, and the force used to obtain a balloon containing heroin secreted in her mouth included a chokehold and back-slapping during a one- or two-minute struggle); *State v Jacques,* 225 Kan 38; 587 P2d 861 (1978) (police conduct was not shocking to the conscience where the defendant, who had been observed placing balloons in his mouth, refused to cooperate with police demands that he spit them out, and, in the ensuing scuffle, one officer placed his hand on the defendant's throat to prevent the balloons from being swallowed); *State v Santos,* 101 NJ Super 98, 102; 243 A2d 274 (1968) (the defendant claimed that police brutality with regard to his accomplice rendered the accomplice's testimony inadmissible; the police had grabbed the accomplice by the throat and had attempted to pry open his mouth in an effort to obtain glassine envelopes containing narcotics; the court rejected the claim, stating, "The police have a right short of outright brutality of a shocking nature to apply such reasonable force to a suspect as is fairly necessary to prevent an imminent

destruction of evidence of the commission of crime."); *Foxall v State,* 157 Ind App 19; 298 NE2d 470 (1973) (no due process deprivation was found where the defendant was seen placing something into his mouth; police officers used a plastic shoehorn to extract tinfoil packets containing narcotics from the defendant's mouth, and the defendant sustained slight injuries in the scuffle); *Hernandez v State,* 548 SW2d 904 (Tex Crim App, 1977) (no *Rochin* problem was found where the officers noticed the defendant attempting to put something in his mouth, the defendant was wrestled to the ground, and his arms were held by one officer while a second officer applied pressure to his throat until he spit out balloons containing heroin). See, also, *United States v Harrison,* 139 US App DC 266; 432 F2d 1328 (1970); *State v Young,* 15 Wash App 581; 550 P2d 689 (1976); *State v Winfrey,* 359 So 2d 73 (La, 1978).

California has waded against the current of the more permissive view taken by many other jurisdictions by altogether outlawing conduct involving the application of force to a defendant's throat to prevent him from swallowing evidence. See, *e.g., People v Sanders,* 268 Cal App 2d 802; 74 Cal Rptr 350 (1969); *People v Martinez,* 130 Cal App 2d 54; 278 P2d 26 (1954). However, a California Court of Appeals, in a recent case, sanctioned a procedure seen as less threatening to the defendant's well-being, *i.e.,* forcing the defendant's chin upon his chest to keep him from swallowing. *People v Lara,* 108 Cal App 3d 237; 166 Cal Rptr 475 (1980). The Washington Court of Appeals has subscribed to the California "no-choke" position in *State v Williams,* 16 Wash App 868; 560 P2d 1160 (1977). For a critique of decisions which in every instance purport to disallow seizure of a defendant's throat to

retrieve evidence, see 2 LaFave, Search and Seizure, A Treatise on the Fourth Amendment, § 5.2(i), p 296.

In summary, the United States Supreme Court has stated that intrusive searches which, with a view toward all of the circumstances, so denigrate human dignity that they shock the conscience or in some other way are unreasonable under Fourth Amendment standards may not be sanctioned. State and lower federal courts which have had occasion to consider the precise issue presented by this case in light of the Supreme Court's dictates for the most part have condoned the reasonable use of force to retrieve evidence of a crime which has been secreted in the mouth.

V

On the basis of the discussions of intrusive searches undertaken by the United States Supreme Court in *Schmerber* and *Rochin,* with courteous reference to the positions adopted by a number of other jurisdictions confronted with this delicate constitutional question, and after consideration of the facts presented, we conclude that the search conducted in the case at bar did not abridge defendant's right to be free from unreasonable searches and seizures.

In this state, law enforcement officers making an arrest are authorized to recover from the person being arrested "incriminating articles which he may have about his person". MCL 764.25; MSA 28.884. Of course, any attempt to recover these incriminating articles must be accomplished in a manner which comports with the hallowed dictates of our federal and state constitutions, *e.g.,* to with-

stand scrutiny under the Fourth Amendment, any search must be reasonable. Reasonableness is to be ascertained from the totality of the circumstances. *Schmerber, supra.*

We find that the police conduct practiced here to retrieve evidence from defendant's mouth did not constitute conduct shocking to the conscience under *Rochin.* As indicated previously, *Rochin* involved a sequence of illicit police activity which culminated in the forcible search of the defendant's stomach. The facts of this case are radically different. Here, there was no aggregation of unlawful governmental conduct, nor was the intrusion into defendant's body of such a serious nature.

Nor has it been demonstrated that these facts, when measured against the Fourth Amendment principles of reasonableness enunciated in *Schmerber,* require suppression of the critical evidence against defendant. The tests outlined in *Schmerber* for differentiating between minor (*i.e.,* constitutional) and major (*i.e.,* unconstitutional) body intrusions have been amply satisfied in this case. On the basis of their past experiences with defendant (his invariable loquaciousness and his previous arrest for a narcotics violation), their observation of defendant's chewing motions, and the presence of open film canisters between defendant's legs on the seat of the car, canisters which these experienced officers knew were frequently connected with the drug trade, Officers DiMattio and O'Connell had a "clear indication" that defendant had secreted contraband in his mouth. The method and manner of the search were not unreasonable: defendant remained standing throughout; the search took a relatively brief time; defendant's

blood supply and air passages were not restricted or cut off; defendant did not require hospitalization and did not appear to be injured as a result of the contact; and it appears that no more force was used than was reasonably necessary.

Moreover, exigent circumstances were present which would have made it extremely impractical for the officers to obtain a warrant. Defendant was in the process of destroying what was likely the only evidence the government had to convict him of possession of narcotics. The officers were without particular knowledge of whether this evidence was packaged in a receptacle which would be impervious to intestinal processes (should such foolproof packaging exist). Had the narcotics been in loose form, the evidence could have dissipated in defendant's bloodstream before blood analysis could be undertaken (assuming a small quantity was ingested). Or it is quite possible that, had the officers not forced defendant to expel the substance, there would have been no defendant left to prosecute. Further, although defendant's constitutional contentions may not be well-satisfied by stating that less reasonable procedures could have been employed by the officers, it is worth noting that defendant's objections would certainly have been more forceful had the officers permitted him to swallow the contraband and then hauled him off to a hospital to have his stomach pumped. No less intrusive alternatives (e.g., the monitoring of body wastes) were reasonably available to the officers.

This minor intrusion into defendant's mouth is a reasonable search under the limited circumstances of this case.

## VI

We agree with the Court of Appeals that the

trial judge did not clearly err in his determination of defendant's motion to suppress the evidence. The conduct of the police officers did not violate defendant's right to be free from unreasonable searches and seizures under either the United States or the Michigan Constitutions.

Affirm.

FITZGERALD, C.J., and WILLIAMS and RYAN, JJ., concurred with COLEMAN, J.

LEVIN, J. *(for reversal).* Charles Edward Holloway was convicted by a jury of possession of heroin[1] and possession of cocaine.[2] The drugs were seized following a search of Holloway after he was arrested under an outstanding traffic warrant.

The trial judge denied Holloway's motion to suppress the evidence, finding the search and the resulting seizure not unreasonable. The Court of Appeals held that this determination was not clearly erroneous.[3] We would reverse.

I

On November 23, 1976, two Battle Creek police officers, Nibley DiMattio and Thomas O'Connell, were operating as part of a tactical surveillance unit which concentrates on various forms of street crime, including narcotics offenses. Late that afternoon, while working in plain clothes and driving an unmarked vehicle, they observed Holloway driving a car in the vicinity. The officers followed

[1] MCL 335.341(4)(a); MSA 18.1070(41)(4)(a), since repealed by 1978 PA 368.

[2] MCL 335.341(4)(b); MSA 18.1070(41)(4)(b), since repealed by 1978 PA 368.

[3] *People v Holloway,* 99 Mich App 174; 297 NW2d 607 (1980).

Holloway, pulled him over, and advised him that they had a traffic warrant for his arrest.

The officers then noticed two apparently empty film canisters on the seat between Holloway's legs. As DiMattio removed Holloway from the car to arrest him, Officer O'Connell seized and examined the canisters, finding a brown, powdery residue inside them.

Throughout this period, Holloway was silent and appeared to be chewing on something. After handcuffing Holloway, the officers asked him what was in his mouth. When he refused to answer, the officers forcibly opened Holloway's mouth by pinching his jaws while pressing on his throat to prevent him from swallowing.[4] Several tinfoil packets later found to contain heroin and cocaine were then extracted from Holloway's mouth and subsequently admitted at trial.

At the suppression hearing, Officer DiMattio testified that, at the time of the seizure, he had known Holloway for about two years and was aware of Holloway's recent arrest for possession of narcotics. He further stated that the surveillance unit kept "up almost on a daily basis with driving records, any outstanding warrants, anything that might lead * * * to apprehending * * * in some capacity" people suspected of narcotics trafficking. In fact, just a day or two before the arrest, Officer DiMattio had submitted a LEIN (Law Enforcement Information Network) computer check on Holloway to the Secretary of State's office and determined that his license had been suspended. Both officers admitted that they were not on traffic duty

---

[4] We do not reach the question whether this intrusion was reasonable.

at the time of the arrest, but had the traffic warrant for Holloway's arrest attached to a clipboard in their vehicle. One reason for this practice, according to Officer DiMattio, was so that they would have cause to stop suspected persons and "shake them down".

Holloway maintains that the traffic stop and arrest were an obvious subterfuge to search for narcotics and that the evidence acquired by the subsequent search of his mouth should be suppressed. We agree.

## II

"Pretext arrests" are arrests in which the officer, although making an apparently lawful arrest, is making the arrest to conduct a search for which there is no independent probable cause. The basic principle is simply that "[a]n arrest may not be used as a pretext to search for evidence", *United States v Lefkowitz,* 285 US 452, 467; 52 S Ct 420; 76 L Ed 2d 877 (1932).

The lawfulness of an arrest does not automatically render any contemporaneous search and seizure constitutional.[5] When the officer's purpose is to search, he must have probable cause for the search. If an arrest is a pretext for making a search, then the evidence obtained is inadmissible.[6] When an otherwise unlawful search is made incident to a traffic arrest, the discovery of contraband does not legitimize the search.[7]

[5] *People v Gonzales,* 356 Mich 247; 97 NW2d 16 (1959).

[6] See, *e.g., United States v Harris,* 321 F2d 739 (CA 6, 1963).

[7] *Henry v United States,* 361 US 98; 80 S Ct 168; 4 L Ed 2d 134 (1959).

A

The rationale for the pretext-arrest rule becomes clear upon examination of the policy underlying the rule permitting searches incident to arrest. In *Chimel v California,* 395 US 752, 762-763; 89 S Ct 2034; 23 L Ed 2d 685 (1969), the Supreme Court of the United States said:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."[8]

Thus, an exception to the Fourth Amendment's warrant requirement was created in the case of a search incident to arrest because of the danger that evidence may be concealed or destroyed, and because the police need to protect themselves against potentially dangerous arrestees.

There is no reason for concern about the concealment or destruction of evidence in the case of a pretext arrest. When a person is arrested for a traffic violation, there is almost never evidence of the crime which is the subject of the arrest and, hence, nothing to be destroyed.[9]

There may, however, be some reason for concern about the arresting officers' safety, even where the arrest is for a minor traffic violation. But where the arrest is merely a pretext for making a search

[8] See also *Preston v United States,* 376 US 364; 84 S Ct 881; 11 L Ed 2d 777 (1964); *United States v Robinson,* 414 US 218; 94 S Ct 467; 38 L Ed 2d 427 (1973).

[9] See, *e.g.,* 2 LaFave, Search and Seizure, § 5.2(e), pp 281-282.

which would otherwise violate the Fourth Amendment, the potentially dangerous situation has been created by the officer solely in order to fabricate a justification for searching. It would subvert the Fourth Amendment to permit this artificially created danger to serve as the basis for the search in question.

The constitution permits the police to search in order to facilitate an otherwise lawful arrest. It does not permit them to arrest in order to facilitate an otherwise unlawful search. If this practice were permitted, any minor offense committed by a significant proportion of the population could be used by the police as a basis for arresting and searching whomever they pleased. Recognizing this danger, the Court in *Amador-Gonzalez v United States,* 391 F2d 308, 318 (CA 5, 1968), stated:

"The significant element in this case is the danger that the lowly offense of a traffic violation—of which all of us have been guilty at one time or another—may be established as the basis for searches circumventing the rights guaranteed by the Fourth Amendment."

B

Although the Supreme Court of the United States has yet to thoroughly analyze pretext situations, the Court has indicated that activity involving Fourth Amendment rights undertaken on a pretextual basis is unconstitutional. For example, in *Abel v United States,* 362 US 217, 230; 80 S Ct 683; 41 L Ed 2d 668 (1960), the Court upheld a search incident to the arrest of an illegal alien who claimed that the true motivation of the arresting officers was to search for evidence of espionage. The Court noted that had the arrest been

pretextual, "our view of the matter would be totally different". In *South Dakota v Opperman,* 428 US 364, 376; 96 S Ct 3092; 49 L Ed 2d 1000 (1976), in approving an inventory search of an automobile, the Court added that there was no evidence that the search had been "a pretext concealing an investigatory police motive". Most recently, in *Steagald v United States,* 451 US 204, 215; 101 S Ct 1642; 68 L Ed 2d 38 (1981), police officers, relying upon an arrest warrant, searched the home of a person not named in the warrant, ostensibly to arrest the person named in the warrant. The Court held that, absent exigent circumstances, this practice is unconstitutional. One reason given by the Court was that:

"an arrest warrant may serve as the pretext for entering a home in which the police have a suspicion, but not probable cause to believe, that illegal activity is taking place".[10]

---

[10] *United States v Robinson,* 414 US 218; 94 S Ct 467; 38 L Ed 2d 427 (1973), *Gustafson v Florida,* 414 US 260; 94 S Ct 488; 38 L Ed 2d 456 (1973), and *Scott v United States,* 436 US 128; 98 S Ct 1717; 56 L Ed 2d 168 (1978), do not suggest otherwise. In *Robinson* and *Gustafson,* the Court held that when an officer conducts a search incident to an arrest, the fact that the officer does not think that the suspect is armed is irrelevant as long as, viewed objectively, the arrest is valid. *Robinson* and *Gustafson* do not suggest that when an officer engages in a deliberate subterfuge to avoid the warrant requirement of the Fourth Amendment, the evidence will be admitted. As Justice Powell said in his concurring opinion:

"*Gustafson* would have presented a different question if the petitioner could have proved that he was taken into custody only to afford a pretext for a search actually undertaken for collateral objectives. But no such question is before us." *Gustafson, supra,* p 238, fn 2.

In *Scott,* the defendants argued that evidence obtained by wiretap was inadmissible because the officers failed to make good faith efforts to minimize the number of calls intercepted, in violation of 18 USC 2518(5) and the Fourth Amendment. The Court found it unnecessary to consider whether the agents had acted in good faith because, viewed objectively, the number of calls intercepted was reasonable.

Neither the Supreme Court, nor the Courts of Appeals cases cited in *Scott,* suggested that evidence would be admissible when it is obvious that the search was a deliberate attempt to circumvent the warrant requirement of the Fourth Amendment.

United States Courts of Appeals have said that
the *search* must be incident to the *arrest,* and not
vice versa.[11] Where the arrest is only a sham or a
front being used as an excuse for making a search,
the arrest itself as well as the search is illegal.[12]
From this it follows that, on a showing that an
arrest was made as a pretext to search, the evi-
dence thus obtained must be suppressed.[13]

In *Amador-Gonzalez v United States, supra,* the
United States Court of Appeals for the Ninth
Circuit held that heroin seized after a traffic arrest
had to be suppressed where the arrest was a
pretext to search for narcotics. The Court said that
the officer making the arrest for a minor traffic
violation was not assigned to traffic or general
enforcement, but was a detective in the narcotics
division.

Similarly, in *Taglavore v United States,* 291 F2d
262 (CA 9, 1961), the Court of Appeals found that
the arresting officers had engaged in a deliberate
scheme to evade the Fourth Amendment by using
warrants for traffic offenses to search the defen-
dant for narcotics. These illegal activities rendered
the narcotics seized inadmissible even though the
defendant's conduct had given the officers probable
cause to arrest him for possessing narcotics.

We have found no case sustaining a search
where it was established that the officers' purpose
in arresting was to conduct an otherwise unlawful
search.

C

In the instant case, all the circumstances indi-

---

[11] *E.g., Henderson v United States,* 12 F2d 528, 529 (CA 4, 1926)
("Instead of the search being incidental to the arrest, therefore, the
arrest was incidental to if not a mere pretext for the search.");
*McKnight v United States,* 87 US App DC 151; 183 F2d 977 (1950).

[12] *Worthington v United States,* 166 F2d 557 (CA 6, 1948).

[13] *Worthington v United States,* 166 F2d 557, 566 (CA 6, 1948).

cate that the traffic arrest was merely an excuse to search for evidence of narcotics offenses.[14] Officer DiMattio maintained that the primary purpose in stopping Holloway was to arrest him for a traffic offense. However, judged objectively, the circumstances and the officers' own testimony reveal that the purpose was to search for evidence of narcotics offenses. At the time of the arrest, both officers, members of a tactical surveillance unit, were working in plain clothes and driving an unmarked car. The officers were not on traffic duty nor involved in general enforcement. They did not witness a moving traffic violation, but had earlier obtained a traffic warrant for Holloway's arrest. The officers kept outstanding traffic warrants attached to a clipboard in their vehicle so that they would have cause to stop persons suspected of narcotics trafficking and "shake them down". Officer O'Connell stated that after Holloway was stopped he got into Holloway's vehicle, sat down next to him, told him that he was under arrest, and then seized the canisters on the seat between Holloway's legs. He did not say that he had stood outside the car until Officer DiMattio told him about the film canisters, as Officer DiMattio testified. Officer O'Connell had no need to enter Holloway's vehicle in order to execute the traffic warrant, but it did place him in an advantageous position to search for contraband.

Under these circumstances, where it is unnecessary to speculate about the officers' subjective

<hr />

[14] See also *United States v Keller*, 499 F Supp 415, 416, 418 (ND Ill, 1980), in which the officer testified that he "stopped [the defendant] on [a] technical traffic violation only because he hoped to recover evidence of a more serious crime". The officer then searched the defendant and found several stolen credit cards in his wallet. The Court held that "since the technical traffic violation stop of Keller was purely pretextual, all evidence derived from it should be suppressed".

intent because the objective evidence is clear, it is apparent that the purpose of the arrest was to search. The fruits of the search must therefore be suppressed.

### III

It is argued that the search ensued from "plain view" observations made by police officers after a legitimate stop. The plain-view doctrine is, however, subject to limitations.[15] The plain-view exception to the search-warrant requirement developed from the notion that if police happen upon evidence in the course of their legitimate activities, they should not be required to avert their eyes and ignore it. This reasoning does not apply where the plain-view observations resulted from a pretext arrest.[16] Just as the police may not use an arrest as a subterfuge for conducting a search, neither may they use an arrest as a subterfuge for making plain-view observations.

The plain-view rule, like the search incident to arrest rule, carves out an exception to the Fourth Amendment. As such, it should not be allowed to

[15] One requirement of the plain-view doctrine is that objects observed must be immediately recognizable as evidence incriminating the accused. *Coolidge v New Hampshire,* 403 US 443; 91 S Ct 2022; 29 L Ed 2d 564 (1971). In the case before us, the record discloses conflicting testimony as to whether the canisters between Holloway's legs were open at the time of the seizure. While both arresting officers maintained that the tops were off the canisters, Officer O'Connell stated that he "opened them up and took a look inside". Whether the film canisters, open or closed, could be regarded as objects which are immediately recognizable as evidence or implements of a crime is at best uncertain.

[16] Accordingly, we disapprove of *People v Edwards,* 73 Mich App 579; 252 NW2d 522 (1977), to the extent that it implies that evidence obtained as a result of a "pretext" arrest, but in plain view, is admissible as long as the arrest is not used as a pretext for conducting a search.

overreach its justification. There is good reason for permitting the police to make use of evidence discovered inadvertently in the course of an otherwise necessary intrusion. There is no reason for permitting them to make unnecessary warrantless intrusions in order to obtain evidence which they could not otherwise obtain.

The fruits of plain-view observations[17] are admissible only if the intrusion they follow was justified on some other grounds.[18] This limitation was stated by Justice Stewart in his plurality opinion in *Coolidge v New Hampshire*, 403 US 443, 466; 91 S Ct 2022; 29 L Ed 2d 564 (1971):

"What the 'plain view' cases have in common is that the police officer in each of them had a *prior justification for an intrusion * * *.* The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed

[17] Not every case in which evidence is found in open view is subject to the "plain view" rule. The plain-view rule is an exception to the Fourth Amendment and as such applies only when there has been a "search" or "seizure" within the meaning of that Amendment. Where, for example, the police see a crime being committed in a public place, there has been no intrusion into a constitutionally protected area. There is thus no reason to meet the requirements of the plain-view exception in support of a subsequent arrest. See 1 LaFave, Search and Seizure, § 2.2(a), pp 240-243; Scott, *"Plain View"—Anything But Plain: Coolidge Divides the Lower Courts,* 7 Loyola U of L A L Rev 489 (1974); Moylan, *The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle,* 26 Mercer L Rev 1047 (1975).

The stopping of defendant's automobile was an intrusion into a constitutionally protected area, and thus the limitations on plain-view searches and seizures apply. As the Supreme Court stated in *Terry v Ohio*, 392 US 1, 19, fn 16; 88 S Ct 1868; 20 L Ed 2d 889 (1968):

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

[18] *Harris v United States*, 390 US 234, 236; 88 S Ct 992; 19 L Ed 2d 1067 (1968).

against the accused—and permits the warrantless sei-zure."[19] (Emphasis supplied.)

The plain-view exception to the Fourth Amend-ment thus applies only where the intrusion which led to the plain-view sighting was itself justified on other grounds. The plain-view exception does not apply[20] where the arrest was merely a pretext for a search.

---

[19] None of the justices in *Coolidge* disputed this limitation. 403 US 490 (Harlan, J., *concurring)*; p 492 (Burger, C.J., *dissenting in part and concurring in part)*; p 493 (Black, J., *concurring and dissenting)*; p 510 (White, J., *concurring and dissenting)*.

[20] There is another reason for our willingness to apply the plain-view doctrine to the officers' observations at the time of the arrest. In his opinion in *Coolidge,* p 469, Justice Stewart announced a second limitation on the plain-view doctrine:

"The second limitation is that the discovery of evidence in plain view must be inadvertent."

One commentator has suggested that Justice Harlan's concurrence implicitly accepts this limitation, giving it the support of a majority of the *Coolidge* Court. Moylan, fn 16 *supra,* pp 1048-1049. Most courts have adopted this limitation. See cases collected in *Scott,* fn 16 *supra,* pp 508-509, fn 129.

The inadvertence limitation, like the pretext-arrest rule, is designed to prevent the police from making otherwise lawful intrusions into constitutionally protected areas, in order to obtain evidence that they could not lawfully obtain by other means. To ensure that the plain-view doctrine does not provide any additional incentive for making these intrusions, Justice Stewart thought it wise to limit the admissi-bility of evidence found in plain view to evidence which is discovered inadvertently. By definition, if the evidence is discovered inadver-tently, the intrusion could not have been motivated by the officers' desire to find it. If the intrusion would not have been conducted absent the expectation that evidence would be found, it is not justified by that expectation alone.

"Justice Stewart may well have meant that plain-view seizures must be limited to inadvertent discoveries in order to prevent the police from using the exception in conjunction with a deliberately timed arrest to seize evidence that, absent a judicially authorized search warrant, would remain hidden.

\* \* \*

"In this not uncommon situation, where the police have probable cause to arrest, their best strategy is to defer arrest until the suspect is at home so that they have a chance of discovering evidence in plain view which they would not have had if they made their arrest elsewhere. This use of the arrest power for the ulterior purpose of

The arrest of Holloway was pretextual, and the search and seizure unreasonable. Reversed.

KAVANAGH, J., concurred with LEVIN, J.

RILEY, J., took no part in the decision of this case.

gaining access to a person's house amounts to a planned warrantless search and seems at the heart of Justice Stewart's concern. * * * [I]f non-inadvertence means a less than probable cause expectation that certain evidence will be found, the plurality's rule eliminates the efficacy of this type of police behavior and limits the invasion of a citizen's privacy upon arrest to the formal seizure of his person and a limited search incident to the arrest." *The Supreme Court, 1970 Term,* 85 Harv L Rev 40, 244-245 (1971).