Lu, John T., J.
INTRODUCTION
The defendant, Edwin Ramirez (Ramirez), moves to suppress statements, observations, and physical evidence seized on March 22, 2006, from Ramirez and from the property at 73 Boutelle Street in Fitchburg; and evidence, statements or observations from telephone calls on March 22 and 23, 2006, to a cell phone seized from Ramirez on March 22, 2006.
Ramirez moves to suppress because he claims the search warrant fails to satisfy the particularity requirement; the search warrant application failed to establish a sufficient nexus between drug dealing and Ramirez’s apartment at 73 Boutelle Street; the searches and seizures exceeded the scope of the search authorized by the warrant; in answering the cell phone, police employed an illegal wiretap in violation of G.L.c. 272, §99; and, statements by the defendant were obtained without the required Miranda warnings and were involuntary.
On November 20, 2006, the court heard testimony from Sergeant-Detective Gary Ouellette (Ouellette), Detective John Mackey (Mackey), Detective Perry Pappas (Pappas), and Ramirez.
The court agrees that certain of Ramirez’s statements must be suppressed. Otherwise, the court declines to adopt Ramirez’s arguments.

FINDINGS OF FACT

Based on the evidence presented and reasonable inferences from the evidence, the court makes the following findings of fact.
1. On March 18, 2006, the Fitchburg District Court issued a warrant to search the second-floor apartment and its curtilage, and the common area at 71/73 Boutelle Street, and to search Ramirez, for the following items:
*512 heroin in any form as described in MGL 94C and/or any other controlled substance which [has] been manufactured, delivered, distributed, dispensed, or acquired in violation of 94C of the MGL. all paraphernalia used in the cutting, weighing and bagging for the distribution of controlled substances; all materials, products, and equipment of any kind which are used or intended for use in the manufacture, compounding, processing, delivering, dispensing, distributing, importing or exporting of said controlled substances in viol, of c. 94C. all books, papers, ledgers and notes showing dealings in controlled substances; all monies which are the proceeds of the sale of said controlled substances; any keys, media, pagers, cell phones, keys to safes, safes or keys to safety deposit boxes.
2. Between 9:00 and 9:30 A.M., on March 22, 2006, numerous police officers including Ouellette, Mackey and Pappas were outside the building preparing to execute the warrant.
3. Ouellette was an experienced drug investigator.
4. After using heroin, Ramirez, a long-time heroin addict, walked out of the apartment, placed a Dunkin’ Donuts bag on top of a trash container, walked to his Ford Expedition, got in and started the engine. The trash container was located in an area where trashcans were kept. The trashcans were not locked, fenced-in, or shielded from public access in any way, and Ramirez or the occupants of the apartment he exited from did not have exclusive access to them.
5. A police officer in a police car pulled behind the SUV and Ouellette went to the driver’s side of Ramirez’s SUV, opened the door, told Ramirez that he was a police officer and to get out.[1]
6. Ramirez reached to the middle console of the SUV and did not get out. Ouellette grabbed Ramirez’s left wrist and saw that Ramirez had a clear plastic bag containing a light tan, brownish substance in his right hand. Ouellette thought that the plastic bag contained heroin and that the SUV, which was running, might be in gear.
7. Ramirez tossed the bag into his mouth and tried to grab a Gatorade bottle in the console to drink from to assist in swallowing the heroin. Ouellette and Detective Fitzpatrick pulled him out of the car, struggling, while he continued to chew. After a violent struggle in which police were trying to stop Ramirez from driving off and injuring one of them, as well as trying to stop him from swallowing the drugs, by punching him in the face and hitting him, police got him on the ground and handcuffed him. This took about thirty seconds. He succeeded in swallowing the baggie. When police were able to handcuff him, they stopped hitting him. They did not use weapons. Given that the engine of the Expedition was running and police thought it might be in gear, they used reasonable force.
8. Ramirez said that he was going to sue them. Police told him that they gave him time to stop and that he had decided to “go with Carlito,” a reference to selling heroin and crime.
9. The parking space in which the truck was parked was either on the edge of private property and bordering on public property or on public property. It was not in a parking space shielded, in any significant way, from public access or view.
10. Ouellette went to a trash container by the side of the house and retrieved a crumpled up Dunkin’ Donuts bag lying on the top of the can, in plain sight, where Ramirez had placed it on his way to the SUV; inside was a cellophane bag with 29 smaller cellophane bags, similar in appearance to the one Ramirez swallowed.
11. Police searched Ramirez and found $857 cash in his pocket; they also found a cell phone on him and another four cell phones in the truck, all from areas under the control of Ramirez from where he was seated. The cell phone on Ramirez and a Sony Ericsson phone they found on the passenger seat worked. The Sony Ericsson phone was constantly ringing. Pappas answered it and the caller said, “Edwin, this is Kelly, I need two and I’ll be at the Burbank Hospital.” In a second call, the caller said, “Edwin, this is Justin, do you have the good stuff yet?” Pappas told him to call back later. Half an hour later Justin called back and Pappas again told him to call later.
12. Pappas participated in entry into the second-floor apartment. Police found cash in a bedroom and drug residue, scissors, a knife, and a box of clear baggies on a kitchen counter. The residue field-tested positive for heroin. In the trash they found a Blockbusters bag with cut comers from plastic baggies. They also found a receipt in the name of Edwin Ramirez.
13. Ouellette told police in charge of Ramirez’s booking that he had medical concerns about him. While in the booking area of the Fitchburg Police Department, Officer Dean Romano was assigned to escort Ramirez to get medical attention. He took him to Burbank Urgent Care about a mile and a half from the police station. A nurse asked why they were there. Romano told Ramirez to tell her why. Ramirez said, “Because I ate a bundle.” The nurse did not understand and Ramirez said, “Ten bags.” Romano said, “heroin.” Later, before leaving, Ramirez said that he wanted to go to court, that he had eaten a bundle when he was startled by a police officer at the door to his car and that it was “shit” and was not strong enough to cause a problem.
14. After about 30 to 45 minutes, facility officials told Romano that they would not treat him for swallowing dmgs and that Ramirez should be transferred to Leominster Hospital. An ambulance took Ramirez to the hospital, about ten miles away, as Romano followed. Upon arriving at the hospital, Romano saw *513 that Ramirez was very sick and appeared to be overdosing on drugs. The medical staff told Romano that “he had a problem” on the way to the hospital and that they gave him Narcan, intended to counteract heroin and opiates, in the ambulance. Ramirez was hallucinating, seeing shadows where there were none. Romano held his hand, comforted him and told him to be strong. Ramirez thought he was going to die. Ramirez was medflighted to UMass Medical Center.
15. Police did not, at any time, give Ramirez Miranda warnings.
DISCUSSION
A) PARTICULARITY OF THE SEARCH WARRANT
“Search warrants shall designate and describe the building, house, place, vessel or vehicle to be searched and shall particularly describe the property or articles to be searched for.” G.L.c. 276, §2. The document must sufficiently limit the discretion of the executing officers so that reference by them to that document makes a “general search under it impossible and prevents the seizure of one thing under a warrant describing another.” Marron v. United States, 275 U.S. 192, 196 (1927). Article 14 of the Massachusetts Declaration of Rights requires a “special designation of the . . . objects of search ... or seizures,” which “both defines and limits the scope of the search and seizure, thereby protecting individuals from general searches.” Commonwealth v. Pope, 354 Mass. 625, 629 (1968). The Commonwealth bears the burden of persuasion. Commonwealth v. Taylor, 10 Mass.App.Ct. 452, 455 (1980).
The search warrant in this case described with particularity the place to be searched because it provided the street address, a physical description of the building, and the location of the apartment to be searched within that building. See Commonwealth v. Rugaber, 369 Mass. 765, 768-69 (1976) (warrant sufficient despite inaccurate physical description of place to be searched, where correct address and where knowledge of officers on scene eliminated risk of searching incorrect premises).
The search warrant described with particularity the person to be searched because it provided the name of the person and his birth date. See Mass.R.Crim.P. 6(b)(1) (“An arrest warrant issued pursuant to this rule shall be signed by the official issuing it and shall contain the name of the defendant or, if the name is unknown, any name or description by which he can be identified with reasonable certainty”).
The degree of specificity required when describing the goods to be seized may necessarily vaiy according to the circumstances and type of items involved. Commonwealth v. Frieberg, 405 Mass. 282, 299 (1989). See United States v. Robertson, 21 F.3d 1030, 1033 (10th Cir. 1994) (“warrant that describes items to be seized in broad and generic terms may be valid if the description is as specific as circumstances and nature of the activity under investigation permit”).
Supreme Judicial Court decisions have highlighted the importance of the determination that the police could not have described the property in more detail. Commonwealth v. Rutkowski, 406 Mass. 673, 676 (1990) (“Not only were the guns and at least five pieces of jewelry capable of specific description, written descriptions had been presented to the magistrate, were thus available, and could properly have been incorporated into the search warrant, directly or by referenced annexation”); Freiberg, 405 Mass. at 299 (“Under these circumstances, the police could not be expected to describe with detailed precision the items to be seized when the exact characteristics of those items were not known to them. To hold otherwise would unreasonably thwart the ability of the police to investigate a crime immediately after its occurrence”). The police could not have described the property to be seized with greater detail. The search warrant described with sufficient particularity the property to be seized.
B) NEXUS TO THE APARTMENT
CRI 1, an informant with demonstrated reliability, said that Edwin used runners to deliver illegal drugs and that he only delivered when there was a problem with a runner. Immediately after the telephone call arranging controlled buy #1 the runner, Jose Feliciano, went to the target apartment and left “a couple minutes later.” Feliciano, who was also Ramirez’s nephew, drove a black Avalanche and was later arrested in an unrelated case, with 42 bags of heroin consistent with the heroin he sold in controlled buy #1. Controlled buy #2 was arranged through Edwin, who referred the buyer to a different runner, Luis, who said it was Edwin’s stuff.
Controlled buy #3 was through Flaco, a third runner, who used a Honda Civic. He also said it was Edwin’s stuff. Undercover buy #1 was done by Flaco, who was seen at the target apartment the next day. Immediately following undercover buy #2 the sellers were arrested. Edwin repeatedly called their cell phones while they were under arrest.
Controlled buy #2 was arranged by phone with Edwin, who came out of the target address, got in the Ford Expedition, drove to the meet and sold. Undercover buy #2 and Controlled buy #4 were accomplished within 48 hours of the search warrant application.
Although this case is not identical to Commonwealth v. Santiago, 66 Mass.App.Ct. 515, 521-24 (2006), further app. rev. den. at 447 Mass. 1109 (2006), Santiago controls this case. In Santiago, there were four controlled buys in the general area of the target location. In the second controlled buy the seller went to the target location just before the sale. One of the sellers was seen going in and out of the target location numerous times as if he lived there. The *514 informant said that at least once a seller left the target location and went directly to the informant and sold drugs. The affidavit described other locations. Experienced narcotics investigators described a large-scale operation that likely used multiple locations including the target location to store records.
In this case, there was a medium scale operation using three different runners, Edwin Ramirez and multiple cars. No other addresses are identified as involved in the operation. In one buy the runner, Feliciano, went to the target operation as if to pick up the drugs. The last buy was done by Edwin who simply left the apartment and made the delivery. This was within 48 hours of the search warrant application. It is true that the police did not opine, based on their expertise, that the records were likely at the target location but read in a common-sense fashion a sufficient, if not overwhelming, nexus has been shown. Contrast Commonwealth v. Stegemann, February 22, 2007 (Appeals Court no. 05-P-738, Brown, J. concurring) (insufficient nexus to apartment where no recent drug activity connected to apartment).
In Commonwealth v. Gallagher, 68 Mass.App.Ct. 56, 59-61 (2007), no further app. rev. cite available, the Appeals Court summarized the holding in Santiago as “where the affidavit stated that on one occasion the defendant’s partner went to a house, came out shortly thereafter, and went directly to the informant to sell him drugs, and that on another occasion the defendant himself exited the front door of the same house and went directly to the informant to sell him drugs, the affidavit established probable cause that evidence of the defendant’s narcotics operation could be found in the house.”
C)THE WIRETAP CLAIM
“ [I]t shall not constitute an interception for an investigative or law enforcement officer, as defined in this section, to record or transmit a wire or oral communication if the officer is a party to such communication . . . and if recorded or transmitted in the course of a designated offense as defined herein.” G.L.c. 272, §99. Commonwealth v. Vieux, 41 Mass.App.Ct. 526, 527-32 (1996), furth. app. rev. den. at 424 Mass. 1103 (1996) (no illegality in listening in on extension phone), United States v. De La Paz, 43 F.Sup.2d 370, 375-76 (S.D.N.Y. 1999) (Mukasey, J.) (FBI agent may answer defendant’s cell phone during booking). The practice of police answering a suspected drug dealer’s cell phone during an arrest, without more, is not an illegal wiretap or electronic interception. Commonwealth v. Blood, 400 Mass. 61 (1987).
D)SCOPE OF SEARCH WARRANT
Where the search has been conducted pursuant to a warrant, the burden is on the defendant to show that the evidence was illegally obtained. Commonwealth v. Taylor, 383 Mass. 272, 280 (1981). Avalid search may include any area, place, or container reasonably capable of holding the particular object that is the focus of the search. Commonwealth v. Wills, 398 Mass. 768, 774 (1986). The search of the second-floor apartment, and the seizure of items found there, were within the express terms of the search warrant. Also, the search warrant expressly extended the scope of the search to the curtilage of the second-floor apartment and the common areas of 71/73 Bou telle Street, which included the exterior trash and the Dunkin’ Donuts bag placed on top of the trash by Ramirez. See Commonwealth v. Montanez, 410 Mass. 290, 300-03 (1991) (defendant had no reasonable expectation of privacy in area above dropped ceiling directly outside defendant’s apartment, where the hallway was a common area accessible to the public and freely used by others, and the defendant neither owned nor controlled access to the hallway). Further, the search warrant extended the scope of the search to the person of Edwin Ramirez.
The search warrant did not expressly extend the scope of the search to the Ford Expedition. See Commonwealth v. McCarthy, 428 Mass. 871, 873-74 (1999) (search of apartment tenant’s automobile is outside the scope of a search warrant authorizing the search of his apartment, but not his automobile). The search of the Expedition was permissible because the police officers searched the automobile incident to the arrest of Ramirez for assault and battery on a police officer and the drug offenses described in the search warrant affidavit. G.L.c. 276, §1. See Commonwealth v. Sweezey, 50 Mass.App.Ct. 48, 52-53 (2000) (motor vehicle search incident to arrest for assault and battery permissible where there was probable cause to arrest for illegal drug possession).
E)POLICE HITTING OF RAMIREZ
The search warrant did not extend the scope of the search to Ramirez’s body cavities. See Rodriques v. Furtado, 410 Mass. 878, 888 (1991) (manual body cavity search allowable only with a warrant by a judge, not a magistrate, upon a showing of particularized need supported by a high degree of probable cause). Police had mixed motives in hitting Ramirez; they were simultaneously attempting to disable Ramirez so that he did not injure someone with the Expedition and trying to stop him from swallowing the evidence. Given the court’s conclusion that police did not use excessive force, no basis for suppression is shown. People v. Holloway, 416 Mich. 288, 330 N.W.2d 405 (1982), cert. denied, 461 U.S. 917, 103 S.Ct. 1900 (1983) (Michigan Supreme Court approved reasonable force to cause defendant to spit out drugs). Even were the use of force illegal, there would be no evidence to suppress, police were lawfully in the position from which they wrestled with Ramirez and he succeeded in swallowing the drugs.
F) RAMIREZ’S STATEMENTS
Miranda warnings are required only when a suspect is both in custody and subject to state interrogation. Commonwealth v. Morse, 427 Mass. 117, 122-23 *515 (1998). Custodial interrogation occurs where, from the perspective of a reasonable person in the suspect’s shoes, there was: a formal arrest or restraint on the freedom of movement of the degree associated with a formal arrest; and express questioning or its functional equivalent, which includes any words or actions of the police that the police should know are reasonably likely to elicit an incriminating response. Id.
Ramirez’s statement that he was going to sue the police was a spontaneous statement, where Ramirez was not subject to interrogation, because there were no words or actions of the police that the police should have known were reasonably likely to elicit an incriminating response. See Commonwealth v. Clark C., 59 Mass.App.Ct. 542, 545 (2002) (juvenile’s spontaneous statement, “Did my grandmother turn me in?” was not interrogation). The statement was voluntary: In light of the totality of the circumstances surrounding the making of the statement, Ramirez’s will was not overborne to the extent that the statement was not the result of a free and voluntary act. Commonwealth v. Souza, 428 Mass. 478, 483-84 (1998). See Commonwealth v. Stryony, 435 Mass. 635, 646-47 (2002).
Ramirez’s statement that he was at Burbank Urgent Care because he had eaten a “bundle,” or ten bags, was the product of a custodial interrogation because Romano prompted Ramirez to tell the nurse why Ramirez was there. See Commonwealth v. Allen, 395 Mass. 448, 454-58 (1985) (no Miranda violation where law enforcement officials did not prompt or suggest defendant’s responses to nurse’s questions).
Ramirez’s statement that he had eaten a bundle when he was startled by a police officer at the door to his car, and that it was “shit” that was not strong enough to cause a problem was a spontaneous statement, not subject to custodial interrogation, because there were no words or actions of the police that the police should have known were reasonably likely to elicit an incriminating response. See Commonwealth v. Clark C., 59 Mass.App.Ct. 542, 544-48 (2002) (juvenile’s spontaneous statement, “Did my grandmother turn me in?” was not interrogation). Further, that statement was voluntary: In light of the totality of the circumstances surrounding the making of the statement, Ramirez’s will was not overborne to the extent that the statement was not the result of a free and voluntary act. Commonwealth v. Souza, 428 Mass. 478, 483-84 (1998). See Commonwealth v. Stryony, 435 Mass. 635, 646-47 (2002) (“[D]istress, even profound distress does not necessarily mean that a defendant is incapable of withholding any information he conveys”).
ORDER
Defendant Edwin Ramirez’s motion to suppress his statement to the nurse at Burbank Urgent Care that he had eaten a bundle, or ten bags, is ALLOWED. His motions to suppress evidence seized from the apartment pursuant to the search warrant, the conversations that police had with potential drug buyers on Ramirez’s cell phone, the items seized from the Ford Expedition and Ramirez’s other statements are DENIED.

The court disbelieves significant portions of Ramirez’s testimony including his claim that police pointed their guns at him.