COLORADO COURT OF APPEALS                                    **2016COA168**

Court of Appeals No. 15CA1007
Arapahoe County District Court No. 14CR695
Honorable David W. Marshall, Judge
Honorable Elizabeth Beebe Volz, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Tio Everette Carr,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE BERGER
Terry and Booras, JJ., concur

Announced November 17, 2016

Cynthia H. Coffman, Attorney General, Joseph G. Michaels, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Danyel S. Joffe, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     A jury convicted defendant, Tio Everette Carr, of possession of a schedule II controlled substance with the intent to distribute and obstructing government operations.  His sole contention on appeal is that the non-consensual search of his mouth, during which the police discovered unlawful drugs, violated the Fourth Amendment and the trial court thus erred in failing to suppress the evidence obtained during that search.  Because the search did not violate Carr's Fourth Amendment rights, we affirm.

## I.     Relevant Facts and Procedural History

¶ 2     A police surveillance team identified the vehicle Carr was riding in as possibly being involved in drug sales.  As the vehicle left a parking lot, the driver failed to use his turn signal.  The surveillance team tasked two officers to follow the vehicle.  When the officers observed the vehicle speeding and weaving into another lane, they pulled it over.

¶ 3     The first officer approached the driver's side of the vehicle and smelled alcohol and marijuana.  While the first officer was approaching the driver, the second officer approached the passenger side of the vehicle and asked Carr for his driver's license. Carr was silent while handing it to the officer and would not look at

1

the officer or verbally respond to his questions.  Throughout this interaction, Carr had an unlit cigarette hanging from his lips.

¶ 4    The officers then requested that the driver and all of his passengers, including Carr, exit the vehicle and sit on the curb.

¶ 5    While the passengers were sitting on the curb, the second officer noticed that Carr was making chewing motions with his jaw and had a "golf-ball sized" bulge in his cheek.  The officer pointed this bulge out to another officer within Carr's hearing and, according to the testimony of one of the officers at the suppression hearing, upon hearing that, Carr started "squirming" and "fidget[ing] around."

¶ 6    From his training and experience, the second officer was aware that drug dealers sometimes would put drugs in their mouths when confronted by the police.  He also knew the police surveillance team suspected the stopped vehicle was involved in drug sales.  Based on his experience, Carr's silence, and Carr's actions, the second officer asked another officer to handcuff Carr.

¶ 7    Carr then began to attempt to chew and swallow the objects in his mouth.  He refused the officers' commands to spit them out.  He squirmed and thrashed to keep his head out of the officers' reach.

2

¶ 8    Fearing that Carr would swallow what was in his mouth, both destroying potential evidence and possibly harming himself by ingesting drugs, the officers attempted to retrieve whatever was in Carr's mouth. The officers forced Carr to the ground. The second officer grabbed Carr's chin with one hand and pressed on the nerve behind his jaw with the other. The pain caused Carr to open his mouth and spit out a plastic bag. While the second officer was forcing open Carr's mouth, another officer straddled Carr and searched his mouth with her fingers and then a pen.[1] At some point in this process, Carr's lip began to bleed.

¶ 9    One of the officers called the Aurora Fire Department to provide medical treatment for Carr. They arrived with an ambulance and placed Carr on a gurney. The second officer then saw additional bags in Carr's mouth as he again began to chew and swallow. In response, the officer pulled forward Carr's jaw so that

---

[1] It was unclear whether officers actually used a pen to explore Carr's mouth. The testimony at the hearing does not support a finding that they used a pen. However, a police report admitted into evidence at the hearing does support such a finding. The trial court made no such finding either way. In any event, the use or non-use of the pen does not affect our analysis.

he could not swallow. He recovered another three bags from Carr's mouth. In total, ten bags were recovered from Carr.

¶ 10    The contents of the bags tested positive for cocaine, and the prosecution charged Carr with possession of a schedule II controlled substance with the intent to distribute, criminal attempt to commit assault in the second degree, and obstructing government operations.

¶ 11    Carr moved to suppress all evidence resulting from the search of his mouth. After a hearing on the motion, the trial court found the officers had probable cause to arrest Carr, and that the search of Carr's mouth was a lawful search incident to arrest. Carr appeals the denial of his motion to suppress and the judgment of conviction.

## II.    Standard of Review

¶ 12    A trial court's suppression ruling presents a mixed question of fact and law. *People v. Medina*, 25 P.3d 1216, 1223 (Colo. 2001). This court defers to the trial court's findings of fact, unless they are clearly erroneous, but reviews its conclusions of law de novo. *People v. Gothard*, 185 P.3d 180, 183 (Colo. 2008).

III.    The Search Did Not Violate the Fourth Amendment

¶ 13    The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution protect individuals against unreasonable searches and seizures.  *People v. Brown*, 217 P.3d 1252, 1255-56 (Colo. 2009).  A warrantless arrest or search must be supported by probable cause, *People v. Turner*, 660 P.2d 1284, 1287 (Colo. 1983), and "because of the special insult to human dignity involved when police seek evidence in body apertures or bodily fluids, special rules restrict internal body searches."  *People v. Williams*, 192 Colo. 249, 257, 557 P.2d 399, 406 (1976).  The Supreme Court promulgated these special rules in two seminal cases: *Schmerber v. California*, 384 U.S. 757 (1966), and *Winston v. Lee*, 470 U.S. 753 (1985).  *Schmerber* described the criteria that authorize a constitutional warrantless internal body search,[2] 384 U.S. at 768-72, and *Winston* refined these criteria, 470 U.S. at 761-62.

_____

[2] The Colorado Supreme Court expressly acknowledged and approved these criteria in *People v. Sutherland*, 683 P.2d 1192, 1194 (Colo. 1984).

¶ 14    We first address whether the issue of probable cause is properly before this court.  Although it appears that Carr argued in the trial court that there was no probable cause to arrest him prior to when the officers forced the bag from his mouth, our careful review of the appellate briefs demonstrates that any such argument was abandoned on appeal.  Indeed, the Attorney General's answer brief clearly asserts that Carr did *not* raise the probable cause determination on appeal.  Despite this clear statement of position by the Attorney General, Carr does not take issue with the statement in his reply brief and he does not address at all the question of whether or when probable cause arose to justify his arrest.  *People v. Bondsteel,* 2015 COA 165, ¶ 61 n.6 (*cert. granted* October 31, 2016).  Under these circumstances, we conclude that the only question before us is whether the officers met the additional requirements imposed by *Schmerber* for an internal body search.  We thus assume that probable cause supported Carr's arrest and the search incident to arrest.

¶ 15    In *Schmerber,* the Supreme Court held that, in addition to probable cause for the arrest of the suspect, the Fourth Amendment requires the state to prove three factors to render a warrantless

internal body search constitutional: (1) a "clear indication" that incriminating evidence will be found; (2) exigent circumstances that justify the intrusion and make it impractical to obtain a search warrant; and (3) extraction of the evidence in a reasonable manner and by a reasonable method. *Schmerber*, 384 U.S. at 768-72.

### A. The Officers Had a Clear Indication That There Was Incriminating Evidence in Carr's Mouth

¶ 16 Neither the United States Supreme Court nor the Colorado Supreme Court has defined "clear indication." We thus seek guidance from courts in other jurisdictions.

¶ 17 In *State v. Alverez*, the Utah Supreme Court concluded that officers had a "clear indication that a search would uncover drugs concealed in [Alverez's] mouth." 147 P.3d 425, 435 (Utah 2006). Alverez drove a vehicle the officers suspected was involved in drug sales. The officers observed a "representation" of the "patron saint" of unlawful drug dealings and a bottle of water (which the officers knew could be used to swallow drugs hidden in the mouth) in the vehicle. *Id.* at 430. When the officers questioned Alverez, they noticed he was particularly nervous and was manipulating objects in his mouth. From their training, the officers suspected Alverez

7

had drugs in his mouth which he was attempting to swallow. The court reasoned that "it was [Alverez's] reaction to the officers' request to open his mouth, in addition to the earlier factors, that gave rise to a clear indication." *Id.* at 435.

¶ 18    In *State v. Harris*, the Nebraska Supreme Court held there was a "clear indication" that Harris had drugs in his mouth based on similar circumstances. 505 N.W.2d 724, 731 (Neb. 1993). There, the officers searched Harris' mouth in an interview-detention room.

> Harris had been arrested for a weapons violation, and police found Zig-Zag cigarette papers, sometimes used to smoke marijuana; an electronic pager; and a digital gram scale in his car. The officers also had confiscated marijuana from the passenger in Harris' car. At least one officer at the scene suspected that someone was dealing drugs from Harris' car. Harris was waiting to be strip-searched when [an officer] saw him chewing something. Harris refused to let [the officer] see what was in his mouth and refused to spit the crack cocaine out upon the officer's order.

*Id.* at 731-32. The court concluded that these circumstances were sufficient, in addition to the officer's experience, for her to have "a clear indication that she would find incriminating evidence in Harris' mouth." *Id.* at 732.

8

¶ 19    Here, as in the above-cited cases, the officers believed that Carr was in a vehicle that was suspected to be involved in drug dealing. They saw a large bulge in his mouth. He refused to speak to the officers[3] or reveal what was in his mouth. He was trying to chew or swallow what was in his mouth. The officers had experience or training that indicated that suspects would attempt to swallow drugs. And as in *Alverez,* the suspect began to act furtively once an officer pointed out the bulge in his mouth. 147 P.3d at 435.

¶ 20    On these facts, we conclude that there was a "clear indication" that searching Carr's mouth would uncover drugs.[4]

---

[3] Carr's silence is significant, for these purposes, not so much because he was not speaking, but because he was not opening his mouth to do so.

[4] We recognize that the trial court did not make such a finding. Indeed, as Carr correctly notes, the trial court did not address the *Schmerber* factors at all. Nevertheless, we reject the Attorney General's argument that the trial court's decision prevents us from considering *Schmerber* on appeal. Carr argued in the trial court that *Schmerber* applied. The fact that the trial court did not address *Schmerber* in its order does not bar this court from resolving the issue. *People v. Johnson,* 865 P.2d 836, 840 (Colo. 1994). The historical facts are not in substantial dispute, or in need of development, and the legal significance of those facts is a question of law that we may decide without remanding to the trial court. *People v. Barry,* 2015 COA 4, ¶ 53.

### B. There Were Exigent Circumstances That Negated the Officers' Need to Acquire a Warrant

¶ 21 In the absence of exigent circumstances, warrantless internal body searches violate the Fourth Amendment. *Schmerber*, 384 U.S. at 770. "Exigent circumstances may exist when (1) the police are engaged in a bona fide pursuit of a fleeing suspect, (2) there is a risk of immediate destruction of evidence, or (3) there is a colorable claim of emergency threatening the life or safety of another." *People v. Crawford*, 891 P.2d 255, 258 (Colo. 1995).

¶ 22 No one, much less a police officer without medical training, can know with certainty what will happen when packaged drugs are swallowed.[5] *People v. Cappellia*, 256 Cal. Rptr. 695, 700 (Cal. Ct. App. 1989). The police officers were not physicians, and they were required to make an immediate judgment of whether exigent circumstances existed. They did not know whether the evidence was packaged in a manner such that it would successfully pass through Carr's digestive tract. Even if it was so packaged, when the officers pointed out the bulge in Carr's mouth, he began to try to

---

[5] Some courts have held that officers should recognize certain types of packaging as being immune to dissipation in the digestive process. *See People v. Bracamonte*, 540 P.2d 624, 631 (Cal. 1975).

chew and swallow, which may have broken the seal of one of the bags in his mouth. Under these circumstances, it was reasonable for the officers to believe that the evidence would be destroyed unless they took immediate action.[6] In other words, there were exigent circumstances that justified the search of Carr's mouth.

C. The Officers Searched Carr's Mouth in a Reasonable Manner

¶ 23 Having determined there were exigent circumstances, we now address whether the officers performed the search by a reasonable method and in a reasonable manner.

¶ 24 In *Winston,* the Supreme Court adopted a three-part balancing test to determine when a particular search method is reasonable. 470 U.S. at 761-62. The test balances (1) "the extent to which the procedure may threaten the safety or health of the individual" and (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity" against (3) "the community's interest in fairly and accurately determining guilt or innocence." *Id.*

---

[6] In view of our disposition, we need not address the alternative ground raised by the Attorney General that there was a colorable claim of an emergency threatening Carr's health.

¶ 25    In some cases, the amount of force used threatens the safety

or health of the suspect to such a degree that a Fourth Amendment

violation is obvious.  For example, in *Hereford v. State*, the court

held that tasing a suspect at least eight times while he was

handcuffed, and after any exigent circumstances had passed, was

unreasonable.  339 S.W.3d 111, 119 (Tex. Crim. App. 2011).

Courts have reached similar results in other cases.  *See Conwell v.

State*, 714 N.E.2d 764, 765 (Ind. Ct. App. 1999) (holding that

choking a suspect and macing his face twice was unreasonable);

*State v. Tapp*, 353 So. 2d 265 (La. 1977) (holding that a struggle

that lasted fifteen to twenty minutes where officers pummeled the

suspect's head and face and then pinched his nose to cut off his

breathing was unreasonable).

¶ 26    The first prong of this test has mainly evolved in response to

two particular search methods: (1) serious medical interventions or

drug-induced vomiting and (2) the application of force to the throat

to prevent swallowing.  *Alverez,* 147 P.3d at 437.

¶ 27    Courts generally disapprove of the first type of method.  The

Supreme Court has held that both the surgical extraction of a bullet

from a suspect to use as evidence against him, *Winston,* 470 U.S. at

766, and the forced pumping of a suspect's stomach, *Rochin v. California*, 342 U.S. 165, 172-74 (1952), were unreasonable. *But see State v. Strong*, 493 N.W.2d 834, 837 (Iowa 1992) (permitting the pumping of the stomach).

¶ 28 In other cases, particularly when force is applied to the suspect's throat — force that could curtail breathing, lead to a loss of consciousness, and possibly cause death — courts are divided in the amount of force that officers can reasonably apply. In *State v. Lewis*, the court held that applying a chokehold and slapping the suspect's back was reasonable. 566 P.2d 678, 681 (Ariz. 1977); *accord Harris*, 505 N.W.2d at 731 (holding that the use of a lateral vascular neck restraint and Heimlich-type maneuver was reasonable); *Hernandez v. State*, 548 S.W.2d 904, 905 (Tex. Crim. App. 1977) (holding that the choking of a suspect was reasonable).

¶ 29 In other cases, courts have permitted some pressure on a suspect's throat. In *Cappellia,* the court held that placing pressure on the suspect's throat was reasonable only if it did not restrict the suspect's breathing. 256 Cal. Rptr. at 700; *accord People v. Holloway*, 330 N.W.2d 405, 410 (Mich. 1982) (holding that it was reasonable to apply pressure to a suspect's throat if that pressure

13

did not cut off blood or air supply); *State v. Taplin*, 676 P.2d 504, 506 (Wash. Ct. App. 1984) (holding that whether a chokehold is unreasonable depends on whether the hold completely obstructs the suspect's breathing).

¶ 30     Here, the officers applied physical force to the back of Carr's jaw and chin, in an effort to pry open his mouth, and searched his mouth with their fingers and then, possibly, a pen.  While the officers caused Carr's lip to bleed, they did not force him to undergo any invasive medical procedures or apply force to his throat.  Under these circumstances, we conclude that the officers' search procedure posed a minimal amount of risk to Carr's safety and health.

¶ 31     The second part of the *Winston* test focuses on the officers' intrusions on Carr's privacy and dignity, rather than his physical safety.  *Winston*, 470 U.S. at 762.  While officers searched Carr's mouth, *Winston* does not prohibit all intrusions and, as the California Supreme Court observed, "the mouth is not a sacred orifice."  *Bracamonte*, 540 P.2d at 632 n.6.  The officers' search, under these circumstances, was not an unreasonable invasion of

14

his body. The officers' intrusion on Carr's privacy and dignity was relatively limited.

¶ 32 The final part of the *Winston* test considers the community interest in correctly determining guilt or innocence, which includes the need to preserve evidence. *Winston,* 470 U.S. at 762. As we concluded above, the officers had reason to believe that Carr would destroy the evidence unless they intervened. Thus, the community had a strong interest in retrieving the potential evidence from Carr's mouth.

¶ 33 Balancing all three of the *Winston* considerations, we conclude that the officers retrieved the evidence in a reasonable manner and by a reasonable method. The minimal risk to Carr's health and safety and the intrusions on his privacy and dignity do not outweigh the community's interest in retrieving the bags in order to determine fairly his guilt or innocence.

## IV. Conclusion

¶ 34 For the foregoing reasons, we conclude that the search of Carr's mouth did not violate his Fourth Amendment rights, and accordingly, the judgment of conviction is affirmed.

JUDGE TERRY and JUDGE BOORAS concur.

15