COLORADO COURT OF APPEALS                          **2016COA180**

Court of Appeals No. 14CA2127
City and County of Denver District Court No. 12CR2735
Honorable J. Eric Elliff, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Rollin Michael Oliver,

Defendant-Appellant.

ORDER AFFIRMED

Division III
Opinion by CHIEF JUDGE LOEB
Davidson* and Plank*, JJ., concur

Announced December 15, 2016

Cynthia H. Coffman, Attorney General, Jacob R. Lofgren, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Rachel K. Mercer, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1     Defendant, Rollin Michael Oliver, appeals the district court's order reaffirming its award of restitution and denying his Crim. P. 35(a) motion to correct that award as an allegedly illegal sentence. Specifically, Oliver appeals the portion of his sentence ordering him to pay $365,565.07 in restitution to the Risk Management Department of the City and County of Denver (the Department). Oliver contends his sentence was not authorized by law because the Department was not a victim for restitution purposes and because, even if the Department was a victim, the bulk of the restitution amount awarded included "loss of future earnings," a type of loss explicitly excluded from the statutory definition of restitution. We disagree and affirm.

## I.     Background and Procedural History

¶ 2     In June 2012, Oliver and a friend were confronted by a group of men at a City Park "Jazz in the Park" event. One of the men in the group punched Oliver's friend. During the altercation, Oliver pulled a gun and fired it in the direction of the group. One of the shots struck a Denver Police officer who was in the vicinity. The officer sustained a bullet wound to the head, and she was pronounced dead at the hospital.

¶ 3　　Police arrested Oliver several hours later, and he was charged with first degree extreme indifference murder. Oliver later pleaded guilty to second degree murder in exchange for dismissal of the first degree murder count and a sentencing range of sixteen to twenty-six years. The district court sentenced Oliver to twenty-six years in the custody of the Department of Corrections.

¶ 4　　The prosecution timely filed a demand for restitution naming the Department as a victim and attached documentation from the Department showing its claimed losses. The prosecution alleged that the Department paid $12,469.42 in medical costs for the officer and $33,219.75 in "survivor benefits" to the officer's dependent minor daughter. It further alleged that the Department owed a balance of $319,875.90 to the officer's minor daughter in "survivor benefits" that were required to be paid to her in the future. In sum, the prosecution stated that the Department would pay a total of $365,565.07 as a result of Oliver's murder of the officer, and it requested an award of restitution in that amount. The district court agreed and ordered Oliver to pay restitution to the Department in the amount of $365,565.07 as part of his sentence.

¶ 5     Several months later, Oliver filed a written objection to the restitution order.  Oliver's objection asserted that the Department was not a "victim" for restitution purposes and, therefore, the restitution imposed by the district court was not legal.  The district court ordered the prosecution to respond to the objection and specifically address whether Oliver's objection was timely.  The prosecution did not respond, and the district court set the matter for a hearing.

## A.     Restitution Hearing

¶ 6     At the outset of the September 2014 hearing, the court determined that Oliver's objection was timely because his argument challenged the legality of his restitution sentence, which could be challenged at any time under Crim. P. 35(a).  The court then allowed testimony and arguments to proceed.

¶ 7     Oliver called Kelly Hopper as his sole witness.  Hopper was an employee of the Department in the Workers' Compensation Unit, and specifically, within the subrogation division.  She testified that her job was to determine if the Department could recoup any of the funds it expended on benefit payouts through subrogation of a third party.  She testified that seeking restitution in a criminal action

3

against a defendant who committed a crime causing the Department's financial loss is one way the Department attempts to recoup such losses.

¶ 8    Hopper explained that the City and County of Denver self-insures its workers' compensation benefits for all employees of the City and County of Denver, including the Denver Police Department (DPD).  According to her testimony, the Department, an agency of the City and County of Denver, manages workers' compensation claims and benefits for all employees of the City and County of Denver instead of a private workers' compensation insurance company.  Hopper repeatedly testified that the Department acted as the workers' compensation insurance company for the DPD and the City and County of Denver as a whole.

¶ 9    Hopper further testified that death benefit payouts under the Workers' Compensation Act of Colorado (the Act), §§ 8-40-101 to 8-47-209, C.R.S. 2016, are fixed by a statutory formula using the deceased worker's average weekly wage.  Specific to this case, she stated that the Department had made and would continue to make required payments to the deceased officer's minor daughter using

4

this formula, regardless of any subrogation or restitution determination.

¶ 10    At the conclusion of Hopper's testimony, Oliver's counsel argued that the Department was not a victim under the applicable restitution statute because, under Colorado law, a government agency such as the Department could not be a victim for restitution purposes unless certain conditions were met, and those conditions were not present in this case.  Counsel did not argue that it was improper to include the death benefits in the restitution amount because the officer's average weekly wage was used to calculate the death benefits owed to the minor daughter.  As pertinent here, the prosecution argued that the Department was a victim for purposes of restitution because it was an insurer that suffered a pecuniary loss as a result of Oliver's murder of the officer.  Oliver responded by arguing that the Department could not be considered an insurer because there was no evidence of a contract between the deceased officer and the Department.

B.    The District Court's Findings and Ruling

¶ 11    The court found that section 18-1.3-602(3)(d) and (4)(a)(VI), C.R.S. 2013, explicitly contemplated government agencies

expending funds for providing medical benefits, health benefits, or nonmedical support services directly related to the condition of the victim and specifically included such agencies in the definitions of restitution and victim.  The court specifically cited and relied on language from the 2013 amendments to section 18-1.3-602 and concluded the Department was a victim and, therefore, entitled to the restitution requested.  The district court, citing section 18-1.3-602(3)(d), (4)(a)(VI), C.R.S. 2013, also specifically found that the Department was an insurer: "[U]nder the statute, the statute specifically contemplates an insurer, including a public insurer like the [Department]. . . .  And so I think under the statute, the [Department] is entitled to restitution."  The court did not expressly discuss or rely on section 18-1.3-602(4)(a)(III), C.R.S. 2013, in its ruling.

¶ 12    Thus, the court reaffirmed its previous restitution award of $365,565.07 and denied Oliver's Crim. P. 35(a) objection to that award.  This appeal followed.

## II.    The Department Was a "Victim"

¶ 13    We first address and reject Oliver's contention that the Department was not a "victim" for purposes of restitution.

6

¶ 14    In support of this contention, Oliver argues that the district court imposed an illegal sentence by making a restitution award to the Department for three reasons: (1) because the court considered and relied on statutory language not in effect at the time Oliver committed his crime in determining that the Department was a "victim"; (2) because, under the statute in effect at the time of Oliver's crime, the Department was not a direct "victim" of Oliver's crime; and (3) because the Department was not a "victim" under section 18-1.3-602(4)(a)(III), C.R.S. 2011, as there was no evidence of a written contract between the Department and the deceased officer.  We consider each of these arguments and, for the reasons below, conclude that the Department, as an insurer, was a victim under section 18-1.3-602(4)(a)(III), C.R.S. 2011.[1]

¶ 15    As an initial matter, we agree with Oliver that the district court erred in considering language from section 18-1.3-602(3)(d), (4)(a)(VI), C.R.S. 2013, in making its restitution award.  The court relied on the 2013 version of the statute, which included amended

---

[1] Although subsection (4)(a)(III) was not altered by the 2012 or 2013 amendments to section 18-1.3-602, we cite to the 2011 version to avoid confusion.  Subsection (4)(a)(III) reads the same in 2016 as it did when Oliver committed his crime.

7

language specifically dealing with public or government agency insurers as victims for purposes of restitution. Ch. 272, sec. 7, § 18-1.3-602(3)(d), (4)(a)(VI), 2013 Colo. Sess. Laws 1429 (capital letters indicating new material). However, this amended language applied only to crimes committed on or after July 1, 2013, and, therefore, did not apply to Oliver's crime, which he committed in June 2012. *Id.* sec. 19, 2013 Colo. Sess. Laws at 1433. Nevertheless, because we conclude that the Department was a victim under section 18-1.3-602(4)(a)(III), C.R.S. 2011, the district court's reliance on the 2013 version of various other provisions of the statute does not compel reversal of the court's restitution ruling. *See People v. Manyik*, 2016 COA 42, ¶ 69 (stating that we may affirm a district court's decision on alternative grounds supported by the record).

## A.  Preservation and Standard of Review

¶ 16    Oliver preserved his argument that the restitution order was not authorized by law because the Department was not a "victim" by his written objection to restitution and his arguments at the restitution hearing. "An illegal sentence is one that is not authorized by law, meaning that it is inconsistent with the

sentencing scheme established by the legislature." *People v. Jenkins*, 2013 COA 76, ¶ 11. We review the legality of a sentence de novo. *People in Interest of J.S.R.*, 2014 COA 98, ¶ 12.

¶ 17 Oliver's arguments involve a question of statutory interpretation, which is also an issue we review de novo. *Jenkins*, ¶ 12. More specifically, "[w]hether the sentencing court interpreted the statutory sentencing scheme correctly is a question of statutory interpretation that we review de novo." *People v. Rice*, 2015 COA 168, ¶ 10. As with any statute, our primary task is to give effect to the General Assembly's intent by first looking to the statute's plain language. *E.g., Candelaria v. People*, 2013 CO 47, ¶ 12. "To discern the General Assembly's intent, we look to the plain language of the statute, and where that language is clear and unambiguous, we engage in no further statutory analysis." *Rice*, ¶ 11.

### B. Applicable Law

#### 1. Restitution Statutes

¶ 18 Every judgment of conviction for a felony offense must include an order of restitution to be paid by the defendant. § 18-1.3-603(1), C.R.S. 2016.

¶ 19    In the 2011 version of the restitution definitions, the General

Assembly defined a "victim" of an offender's conduct for restitution

purposes as follows:

> (4)(a) "Victim" means any person aggrieved by
> the conduct of an offender and includes but is
> not limited to the following:
>
> (I) Any person against whom any felony,
> misdemeanor, petty, or traffic misdemeanor
> offense has been perpetrated or attempted;
>
> (II) Any person harmed by an offender's
> criminal conduct in the course of a scheme,
> conspiracy, or pattern of criminal activity;
>
> (III) Any person who has suffered losses
> because of a contractual relationship with,
> including but not limited to an insurer, . . . for
> a person described in subparagraph (I) or (II) of
> this paragraph (a) . . . .

§ 18-1.3-602, C.R.S. 2011.  Pertinent to the discussion below, the

term "contractual relationship" is not defined in the statute.

¶ 20    The word "person" is defined as "any individual, corporation,

*government or governmental subdivision or agency*, business trust,

. . . limited liability company, partnership, association, or other

legal entity."  § 2-4-401(8), C.R.S. 2016 (emphasis added).  Colorado

courts have previously determined that section 2-4-401(8) applies

to the restitution statutes.  *E.g.*, *Dubois v. People*, 211 P.3d 41, 45-

46 (Colo. 2009) (using section 2-4-401(8) to determine if police officers should generally be eligible for restitution awards); *People v. Webb-Johnson*, 113 P.3d 1253, 1254 (Colo. App. 2005) (stating that section 2-4-401(8) applies to the restitution act).

## 2. Colorado Workers' Compensation Act

¶ 21 The Act provides the *exclusive* remedy to a covered employee for injuries sustained while the employee is performing services arising in the course of his or her employment. *Ferris v. Bakery, Confectionery & Tobacco Union, Local 26*, 867 P.2d 38, 42 (Colo. App. 1993). Under the Act,

> "[e]mployer" means: . . . The state, and every *county*, *city*, town, and irrigation, drainage, and school district and all other taxing districts therein, and all public institutions and administrative boards thereof without regard to the number of persons in the service of any such public employer. *All such public employers shall be at all times subject to the compensation provisions of articles 40 to 47 of this title.*

§ 8-40-203(1)(a), C.R.S. 2016 (emphasis added). DPD, an agency of the City and County of Denver, is a public employer and, therefore, is required to provide all such benefits and compensation to all of its employees under the Act. *See also State Comp. Ins. Fund v.*

11

*Alishio*, 125 Colo. 242, 248, 250 P.2d 1015, 1017 (1952) (city is a public employer for workers' compensation purposes).

¶ 22     The nature of the Act's exclusive remedy creates a framework whereby workers' compensation is an agreement by employers to provide benefits to employees, regardless of fault, and in exchange for assuming that burden, the employer is immunized from claims for tortious injuries to its employees.  § 8-40-102(1), C.R.S. 2016 ("[T]he workers' compensation system in Colorado is based on a mutual renunciation of common law rights and defenses by employers and employees alike."); § 8-41-102, C.R.S. 2016 (abolishing all common law rights and remedies for an employee's action against an employer for injury except as provided in the Act); *Colo. Springs Disposal v. Indus. Claim Appeals Office,* 58 P.3d 1061, 1063-64 (Colo. App. 2002) ("The Act provides workers compensation for job-related injuries, regardless of fault" in return for the employer's immunity from common law claims brought by its employees. (citing *Frohlick Crane Serv., Inc. v. Mack,* 182 Colo. 34, 38, 510 P.2d 891, 893 (1973))).

¶ 23     Employers subject to the Act, including agencies like the DPD, are required to secure insurance for all employees in one of four ways:

> (a) By insuring and keeping insured the payment of such compensation in the Pinnacol Assurance fund;
>
> (b) By insuring and keeping insured the payment of such compensation with any stock or mutual corporation authorized to transact the business of workers' compensation insurance in this state. If insurance is effected in such stock or mutual corporation, the employer or insurer shall forthwith file with the division, in form prescribed by it, a notice specifying the name of the insured and the insurer, the business and place of business of the insured, the effective and termination dates of the policy, and, when requested, a copy of the contract or policy of insurance.
>
> (c) By procuring a self-insurance permit from the executive director as provided in section 8-44-201, except for public entity pools as described in section 8-44-204(3), which shall procure self-insurance certificates of authority from the commissioner of insurance as provided in section 8-44-204;
>
> (d) By procuring a self-insurance certificate of authority from the commissioner of insurance as provided in section 8-44-205.

§ 8-44-101(1), C.R.S. 2016.  Here, the prosecution presented evidence that the DPD was self-insured through the Department pursuant to the above statute.

In at least one instance, a division of this court has concluded that a victim's workers' compensation insurer was entitled to recover claimed losses as restitution.  People v. Rogers, 20 P.3d 1238, 1239-40 (Colo. App. 2000) (holding that in a vehicular assault of a construction flag worker, workers' compensation insurer was a victim and the district court properly imposed restitution for the amount of medical benefits paid by the employer's workers' compensation insurer).[2]  The insurer in that case was the Colorado Compensation Insurance Authority, id.,

---

[2] The division in *Rogers* concluded that the statute's plain language allowed for recovery of the losses claimed by the insurer.  At the time, the statute defined "victim" as "the party immediately and directly aggrieved by a defendant, who is convicted of a criminal act and who is granted probation, as well as *others who have suffered losses because of a contractual relationship with such party*."  *People v. Rogers*, 20 P.3d 1238, 1239-40 (Colo. App. 2000) (citation omitted).  The court concluded that the insurer was a "victim" under such language and, therefore, implicitly determined that the flag worker and the insurer had a contractual relationship.  *Id.*

14

which, after July 2002, became Pinnacol Assurance[3] referenced in section 8-44-101(1)(a).  §§ 8-45-101(4), -123, C.R.S. 2016.

## C.    Analysis

¶ 24    Oliver argues that a government agency such as the Department is not entitled to restitution of funds expended in performing the tasks it was statutorily created and mandated to perform.  The People argue that the Department is not simply a governmental agency in this instance, but is instead an insurer under section 18-1.3-602(4)(a)(III), C.R.S. 2011.  We agree with the People that the Department fits squarely within the definition of a victim insurer under that subsection.

¶ 25    To begin, the Department qualifies as a "person" under subsection (III) because the definition of "person" in section 2-4-401(8) includes a governmental agency.  Next, it is undisputed that the Department suffered losses because it was required to

---

[3] Pinnacol Assurance is the first option given to employers for insuring their employees in section 8-44-101, C.R.S. 2016. Pinnacol is an entity created by the General Assembly as a political subdivision of the state, and it operates as a domestic mutual insurance company.  § 8-45-101(1), C.R.S. 2016.  Pinnacol is explicitly *not* a state agency.  *Id.*

make medical and other benefits payments caused by Oliver's conduct.

¶ 26    Subsection (III) further requires that the person's losses be suffered because of a "contractual relationship" with a person against whom the crime was committed, specifically listing an insurer as an example. § 18-1.3-602(4)(a)(III), C.R.S. 2011. Here, that means that the Department was required to be an insurer who had a contractual relationship with the deceased officer. We conclude that there was such a relationship.

¶ 27    Oliver does not dispute that the officer was employed by the DPD and was working in that capacity at the time he shot her. The DPD, therefore, was responsible under the Act for paying the officer's medical expenses incurred while performing her duties and any other workers' compensation benefits arising from the shooting, including death benefits to her dependents. *E.g.*, § 8-40-203(1)(a) (requiring public employers to provide compensation in accordance with the Act). Hopper's testimony that the DPD pays premiums to the Department in return for the Department's management of all workers' compensation benefits for DPD employees and their dependents is undisputed. Hopper also testified that the

16

Department makes direct payments to entities that provide services to an injured employee (i.e., hospitals, doctors, therapists, etc.) or, in the case of death benefits, to the individual dependents of the employee; the Department does not make payments directly to the DPD or other governmental agencies that pay workers' compensation premiums.

¶ 28     Thus, the record here demonstrates a layered contractual relationship under which the employees of the DPD (and their dependents) are the ultimate intended beneficiaries.  The DPD pays premiums to, and contracts with, the Department for managing and paying workers' compensation benefits; the Department, in return, is contractually obligated to pay valid workers' compensation claims for all employees of the DPD, including the deceased officer here. Although the Department does not have a separate signed written contract with each DPD employee, it is contractually obligated to pay DPD employees' claims directly to those employees, their dependents, or any service providers used by the employees for their work-related injuries.

¶ 29     The record shows that the Department, as an insurer, had an express contract with the DPD, as an employer, to manage and pay

workers' compensation claims under the Act.[4]  Nevertheless, the deceased officer and her dependents were the intended or third-party beneficiaries of the contract between the employer and the employer's insurer.  Black's Law Dictionary (Black's) defines an "intended beneficiary" as "[a] third-party beneficiary who is intended to benefit from a contract and thus acquires rights under the contract as well as the ability to enforce the contract once those rights have vested."  Black's Law Dictionary 186 (10th ed. 2014). Further, the intent of the parties to benefit a third party "need not be expressed in the agreement itself," but can be evidenced by "the surrounding circumstances."  *Villa Sierra Condo. Ass'n v. Field Corp.*, 878 P.2d 161, 166 (Colo. App. 1994).  In this case, that intent is evidenced by a workers' compensation system that necessarily benefits covered employees.  *See Colo. Springs Disposal*, 58 P.3d at 1063-64 (stating that the Act is an agreement between *employer* and *employee* for a mutual waiver of rights).

¶ 30     Hopper's testimony at the restitution hearing and documentary evidence introduced by the prosecution made clear

---

[4] Evidence of the contract comes from Hopper's testimony.  The parties did not submit the contract as evidence at the restitution hearing.

that the City and County of Denver is self-insured for workers'
compensation purposes, and that the Department serves as the
City's insurer for claims under the Act.  For example, Hopper
testified as follows:

- Defense Counsel: "And can you tell the Court exactly
  what is the [Department] and how does it function as an
  insurance company?"
  Hopper: "The City and County of Denver self-insures its
  workmen's [sic] compensation benefits for all employees
  of the City and County of Denver, and [the Department]
  is the office that manages all of that."

- Defense Counsel: "Would it be fair to say that . . . [the
  Department] is the insurance company that insures
  each city agency's workers' compensation benefits
  obligations since 1981?"
  Hopper: "Yes, that is correct."

- Prosecutor: "Is it safe to say that the [Department] is the
  city's insurance company?"
  Hopper: "Oh, yes, sir."

Hopper also testified that the Department is supervised by the Division of Workers' Compensation of the State of Colorado and that the Division monitors the Department the same as it would monitor private insurance companies providing workers' compensation insurance (e.g., Pinnacol).  She further testified that the Department is required to abide by the same requirements as private insurance companies, and the Department collects premiums just like such other insurance companies.

¶ 31     There is no dispute that an insurer can be a victim for purposes of restitution under section 18-1.3-602(4)(a)(III), C.R.S. 2011.  *See, e.g.*, *People v. Woodward*, 11 P.3d 1090, 1092-93 (Colo. 2000) (courts may award restitution to victims' insurers, as well as to the direct victims).  And, as discussed above, a division of this court has previously upheld a restitution order in favor of a workers' compensation insurer.  *See Rogers*, 20 P.3d at 1239-40.  Although the insurer in *Rogers* was the private insurer created by the General Assembly (now Pinnacol), not, as is the case here, a governmental agency, we conclude that this is a distinction without a difference.  *Id.* at 1239.

¶ 32     We decline to interpret the restitution statutes to allow restitution to private workers' compensation insurers, as in *Rogers*, while denying restitution to government agencies that act as insurers in every way under the Act.  *See* § 8-44-204, C.R.S. 2016. In short, we will not punish the City and County of Denver for legally choosing to self-insure its workers' compensation coverage.

¶ 33     We also reject Oliver's argument that the contractual relationship element of subsection (III) of section 18-1.3-602(4)(a), C.R.S. 2011, was not met here because there was no evidence of a written contract between the officer and the Department presented at the restitution hearing.  First, we note that the plain language of subsection (III) does not require a written contract, but only a contractual relationship.  Oliver cites no authority for the proposition that subsection (III) requires a written contract, and we have found none.  Indeed, as discussed above, a division of this court has already upheld a restitution order in favor of an insurer that paid medical benefits for a covered employee, which, in our view, implies that there is a contractual relationship between employees and workers' compensation insurers even though the

employer may be the party who contracts directly with the insurer. *Rogers*, 20 P.3d at 1239-40.

¶ 34    Although the term "contractual relationship" is not defined in the statute, the term can be easily understood. "[W]here, as here, the statute does not define a term, the word at issue is a term of common usage, and people of ordinary intelligence need not guess at its meaning, we may refer to dictionary definitions in determining the plain and ordinary meaning." *Roalstad v. City of Lafayette*, 2015 COA 146, ¶ 34 (quoting *Mendoza v. Pioneer Gen. Ins. Co.*, 2014 COA 29, ¶ 24). Black's defines a contract as "[a]n agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." Black's Law Dictionary 389 (10th ed. 2014). A "contractual obligation" is defined as an "obligation arising from a contract or agreement." *Id.* at 1243. Neither of those definitions is limited to a written document and, in fact, the full Black's entry for "contract" includes myriad types of contracts, including express, written, oral, and implied in fact. *Id.* at 390-99. A contract simply need not be

written to create legal obligations or a relationship arising from the contract.[5]

¶ 35    The definition of the word "relationship" that is most applicable in a contract context is "[t]he nature of the association between two or more people; esp., a legally recognized association that makes a difference in the participants' legal rights and duties of care." *Id.* at 1479.  Thus, a "contractual relationship" is an agreement that creates legally enforceable obligations and a legally recognized association between the parties that changes their legal rights and duties of care.

¶ 36    For all the reasons described above, the relationship among the three parties — the DPD, the Department, and the deceased officer — meets that definition.  The DPD contracted for the Department's services as evidenced by the insurance premiums it paid to the Department and the certificate showing that, since 1981, the DPD has chosen to be self-insured through the

---

[5] "A good many contracts are never expressed in word, or at least not fully in words.  These are genuine understandings between the parties even though they have not been spelled out. . . .  In other words, the contract is proved by circumstantial evidence." *Agritrack, Inc. v. DeJohn Housemoving, Inc.*, 25 P.3d 1187, 1193 (Colo. 2001) (quoting 1 Dan B. Dobbs, *Law of Remedies* § 4.2(3), at 579 (2d ed. 1993)).

Department for workers' compensation benefits. In return, the Department agreed to manage and pay all workers' compensation claims and benefits for the DPD's employees and their dependents. Under the agreement, therefore, the deceased officer and her dependents were third-party beneficiaries of the contract between the DPD and the Department. As third-party beneficiaries, the officer and her dependents had legally enforceable rights under that contract and, therefore, had a contractual relationship with the Department. *See Villa Sierra Condo. Ass'n,* 878 P.2d at 166.

¶ 37 Further, because we conclude that the Department was acting as an insurer with a contractual relationship with the deceased officer, we reject Oliver's reliance on *People v. Padilla-Lopez*, 2012 CO 49, and *People v. McCarthy*, 2012 COA 133, for the proposition that the Department was not entitled to restitution in its capacity as a government agency. In *Padilla-Lopez*, the supreme court held that expenses incurred by a government agency are not typically eligible for recovery under the restitution statutes absent an express legislative provision authorizing them or unless the underlying criminal statute encompasses the agency as a primary victim. ¶ 14 (citing *Dubois*, 211 P.3d at 45-47). The court

24

concluded that the term "victim" in the restitution definitions did not include government agencies that expended funds allocated to them in order to fulfill their public function. *Id.* at ¶ 18. There, the court ultimately concluded that the El Paso County Department of Human Services (DHS) was not entitled to restitution for funds it expended on services for the child victims of the defendant's crimes because the underlying crime of child abuse did not name DHS as a victim and there was no statutory authorization making DHS a victim for restitution purposes. *Id.* at ¶ 20. Rather, DHS expended the funds as a result of its statutory duty to do so, and the agency was not entitled to recover its ordinary operating expenses performing its public function. *Id.*

¶ 38 *Padilla-Lopez* is simply not applicable here because that case did not involve a government agency acting as an insurer. As the district court pointed out in distinguishing *Padilla-Lopez,* DHS was neither a benefits organization nor an insurer. Oliver points to no statute or case law holding that a government agency cannot be an insurer, and we have found none. Indeed, at the restitution hearing, Oliver's counsel repeatedly referred to the Department as an insurance company. Therefore, in this instance, the Department

25

should not be considered an agency seeking recovery of operating expenses, but rather an insurer entitled to restitution under section 18-1.3-602(4)(a)(III), C.R.S. 2011.

¶ 39     *McCarthy* is similarly inapplicable.  In that case, a division of this court concluded that the Department of Health Care Policy and Finance was not entitled to restitution for Medicaid payments it made to a direct victim of the defendant's crimes because (1) the agency was merely expending funds to perform its statutorily mandated function, and (2) it was not an insurer contemplated under subsection (III) *because there was no evidence before the court indicating a* prior *contractual relationship between the agency and the victim.  McCarthy*, ¶¶ 20, 24-26.  Here, by contrast, there is evidence of a prior contractual relationship between the officer and the Department.  Oliver does not dispute that the officer was employed by the DPD prior to and at the time of the shooting.  And, as discussed above, the Department was an insurer that contracted with the DPD to manage and pay all claims for workers' compensation benefits to DPD employees and their dependents. Therefore, the deceased officer and her minor child were intended beneficiaries of that insurance agreement, as evidenced by the

resulting coverage by the Department of the officer's medical claims and death benefits claims.

¶ 40    In sum, we conclude the record is more than sufficient to show that the Department was acting as an insurer with a contractual relationship with the deceased officer when it paid out medical benefits to the officer's medical provider and death benefits to the officer's minor daughter. The district court, therefore, did not err in concluding that the Department was a victim of Oliver's crime for purposes of restitution.

### III.    Death Benefits are not Loss of Future Earnings

In the alternative, Oliver contends that, even if the Department is a victim under section 18-1.3-602(4)(a)(III), C.R.S. 2011, the amount of restitution ordered by the district court was not authorized by law because it included the death benefits already paid to, and expected to be paid to, the deceased officer's minor daughter. In that regard, he argues that because the death benefits were calculated using the deceased officer's average weekly wage, the death benefits constituted "loss of future earnings," a type of loss specifically excluded from the statutory definition of restitution. We disagree.

27

## A. Preservation and Standard of Review

¶ 41    Oliver did not make his "loss of future earnings" argument in the district court. His arguments there focused solely on the Department's status as a restitution "victim." In fact, on multiple occasions, Oliver's counsel reminded the court that Oliver was not challenging the amount or calculation of restitution. We therefore conclude that this contention is not preserved.

¶ 42    Because Oliver's argument was never presented to the district court and is raised for the first time on appeal, we review for plain error. *People v. Ujaama*, 2012 COA 36, ¶ 38. Under the plain error standard, a defendant bears the burden of establishing that an error actually occurred and that at the time the error was made, it was so clear cut, so obvious, a trial judge should have been able to avoid it without benefit of objection. *Id.* at ¶ 42. The defendant must also establish that the error was so grave that it undermined the fundamental fairness of the sentencing proceedings itself so as to cast serious doubt on the reliability of the sentence. *Id.* at ¶ 43; *People v. Banark*, 155 P.3d 609, 611 (Colo. App. 2007).

¶ 43    For the reasons discussed below, we discern no error, let alone plain error.

## B.    Applicable Law

### 1.    Restitution

¶ 44    At the time Oliver shot the officer, the General Assembly

defined "restitution" as

> *any pecuniary loss suffered by a victim and includes but is not limited to all out-of-pocket expenses,* interest, loss of use of money, *anticipated future expenses,* rewards paid by victims, money advanced by law enforcement agencies, money advanced by a governmental agency for a service animal, adjustment expenses, *and other losses* or injuries *proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money.*  "Restitution" does not *include damages for* physical or mental pain and suffering, loss of consortium, loss of enjoyment of life, *loss of future earnings,* or punitive damages.

§ 18-1.3-602(3)(a), C.R.S. 2011 (emphasis added).[6]  "[F]or purposes

of criminal restitution . . . 'loss of future earnings' are earnings not

expected to be received by the victim after restitution is imposed."

*People v. Bryant,* 122 P.3d 1026, 1029 (Colo. App. 2005).  Wages

lost between the date of the crime and the date restitution was

---

[6] Again, although subsection (3)(a) was not altered by the 2012 or 2013 amendments, we cite to the 2011 version to avoid confusion. Subsection (3)(a) reads the same in 2016 as it did at the time Oliver committed his crime.

imposed can legally be ordered as restitution; wages expected to be lost after the date restitution was imposed, "loss of future earnings," cannot legally be included in a restitution order. *Id.*

2. Colorado Workers' Compensation Act Benefits

¶ 45    Under the Act, employees and their dependents are entitled to several kinds of benefits, including medical, disability, and death benefits. §§ 8-42-101 to -125, C.R.S. 2016. In the case of death of a covered employee, the employee's dependents are entitled to compensation as follows:

> In case of death, the dependents of the deceased entitled thereto shall receive as compensation or death benefits sixty-six and two-thirds percent of the deceased employee's average weekly wages, not to exceed a maximum of ninety-one percent of the state average weekly wage per week for accidents occurring on or after July 1, 1989, and not less than a minimum of twenty-five percent of the applicable maximum per week.

§ 8-42-114, C.R.S. 2016. The definition of "dependent" includes minor children of the deceased employee under the age of eighteen,

or under the age of twenty-one if engaged as a full-time student at any accredited school. § 8-41-501(1)(b), (c), C.R.S. 2016.[7]

¶ 46 The Act is to be liberally construed to accomplish its beneficent social and protective purpose. *E.g.*, *Claimants in the Death of Hampton v. Dir. of Div. of Labor*, 31 Colo. App. 141, 145, 500 P.2d 1186, 1188 (1972). In the context of death benefits, "compensation legislation is a system of benefits one of whose independent social objectives is to prevent destitution among dependents of workmen who lose their lives in industrial activity." *Id.* (alteration and citation omitted).

¶ 47 Under the Act, death benefits are a responsibility of the employer, and such benefits are "fixed statutory payments [for] what may be regarded, and were so regarded by the legislature, as the appropriate responsibility of an employer, and not what it actually takes to support a child." *U.S. Nat'l Bank of Denver v. Indus. Comm'n*, 128 Colo. 417, 422, 262 P.2d 731, 733 (1953). The fixed liability and the fixed payments are not a substitute for the actual parents' support of their children. *Id.* Thus, death benefits

---

[7] Here, it is undisputed that the deceased officer's minor daughter qualified as a dependent.

are not intended to be a substitute for a parent's lost wages, but instead are a type of insurance policy for the dependents, payable by the employer.

¶ 48    Death benefits and disability benefits are independent of one another because they protect two distinct rights — one is for the benefit of the worker who is insured; the other is for the benefit of his or her dependents.  This is commonly referred to as the "rule of independence."  *E.g.*, *Hoffman v. Hoffman*, 872 P.2d 1367, 1370 (Colo. App. 1994).  Similarly, death benefits are also distinct from wage loss benefits and compensate individuals for separate losses. *City of Loveland Police Dep't v. Indus. Claim Appeals Office*, 141 P.3d 943, 954 (Colo. App. 2006).

## C.    Analysis

¶ 49    Contrary to Oliver's contention, we conclude, as a matter of first impression, that the death benefits paid and to be paid by the Department were authorized by law as proper restitution because of the following:

- the death benefits are a pecuniary loss;
- the loss was suffered by the Department, a victim of Oliver's crime;

- the loss was proximately caused by Oliver's crime; and

- the loss can be reasonably calculated in money because it was a monetary payout entirely determined by a statutory formula.

§ 18-1.3-602(3)(a), C.R.S. 2011.  Thus, for the reasons below, we conclude that the death benefits paid by the Department under section 8-42-114, although calculated using the deceased employee's average weekly wage, are not equivalent to "loss of future wages."  Rather, the payments are more properly considered the Department's "out-of-pocket expenses" and "anticipated future expenses," both of which are included in the statutory definition of restitution.  *See* § 18-1.3-602(3)(a), C.R.S. 2011.

¶ 50 Under the rule of independence, death benefits owed under the Act are independent of wage benefits because they are owed to the employee's dependents and not to the employee herself.  *E.g.*, *City of Loveland Police Dep't*, 141 P.3d at 954; *Hoffman*, 872 P.2d at 1370.  Because these benefits are independent of any wage benefits required by the Act, and because death benefits are considered the dependents' rights rather than the employee's rights, death benefits cannot be considered the employee's lost future wages.  Instead,

such benefits are simply a type of insurance payout triggered by Oliver's criminal conduct.

¶ 51    Moreover, it is clear under Colorado law that the type of death benefits here, those benefiting a minor child, are regarded as an employer's responsibility — there is no legal dispute over the amount of benefits because the amount is not intended to be equivalent to what it actually takes to raise and support a child. *U.S. Nat'l Bank of Denver*, 128 Colo. at 422, 262 P.2d at 733. Therefore, the average weekly wage of the employee is merely a variable in the statutory formula that is used to calculate the fixed amount of death benefits payable to a deceased employee's dependents.  The method by which this benefit is calculated is simply not relevant to the question whether the Department, as an insurer, can recover through restitution money it paid (and will continue to pay) to a minor dependent of the deceased officer.

¶ 52    In essence, death benefit payments under the Act are meant to compensate a deceased employee's dependents just like any other insurance policy payment.  The death benefit payments here are no different from a life insurance policy that pays out a fixed amount. The fact that the payout amount here is determined by a formula

based on the "policyholder's" wages is a distinction without a difference — the fact remains that an insurer, the Department, was required to pay a death benefit solely because of Oliver's conduct.

¶ 53     Accordingly, we conclude the district court did not err in awarding restitution that included the death benefits owed to the deceased officer's minor daughter.  The payments already made qualified as the Department's "out-of-pocket expenses," and the payments to be made in the future are calculable, fixed "future expenses."  *See* § 18-1.3-602(3)(a), C.R.S. 2011 (defining restitution to include such expenses).

¶ 54     In any event, even if the district court did err, such error was not obvious under the plain error standard because whether workers' compensation death benefits under the Act are "loss of future earnings" excluded from criminal restitution is an issue of first impression in Colorado.  *See Ujaama*, ¶ 42 (stating that an error is obvious if the issue has been decided by a division of this court or by the Colorado Supreme Court).

## IV.   Conclusion

¶ 55     The district court's order reaffirming its restitution award and denying Oliver's Crim. P. 35(a) motion is affirmed.

JUDGE DAVIDSON and JUDGE PLANK concur.